822 A.2d 513

Ross Franklin FAREWELL

v.

STATE of Maryland.

No. 2958, Sept. Term, 2000.

Court of Special Appeals of Maryland.

May 2, 2003.

---

542

544

546

Robert C. Bonsib (Marcus & Bonsib, on brief), Greenbelt, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., SALMON, and KRAUSER, JJ.

MURPHY, Chief Judge.

In the Circuit Court for Montgomery County, a jury convicted Ross Franklin Farewell, appellant, of several offenses that were committed during the course of two armed robberies.[1] Prior to trial, the Honorable Durke G. Thompson denied appellant's Motion to Suppress. During the trial, over appellant's objections, the court permitted the State to make use of a statement given by a non-testifying co-defendant during its cross-examination of a defense witness. Appellant now presents two questions for our review:

I. Whether the trial court erred in denying the Appellant's motion to suppress evidence seized from the

---

1. The jury convicted appellant on fifty-eight counts, and the court sentenced appellant to a total of 180 years imprisonment. Prior to trial, the court severed a number of counts. In this case, the jury convicted appellant of counts nine through sixty-seven.

taxicab and evidence thereafter derived from the unlawful stop, detention, search, and arrest.

II. Whether the trial court erred in permitting the prosecution to use the statement of a non-testifying codefendant during the cross-examination of Joseph Owens.

For the reasons that follow, we shall affirm Judge Thompson's decision to deny appellant's Motion to Suppress, hold that the court erred in allowing the statement of the non-testifying co-defendant to be used under the guise of refreshing the defense witness' recollection, but hold that this error was harmless beyond a reasonable doubt. Accordingly, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEDURAL HISTORY

### Pre-trial Hearing

The central issues at the hearing on appellant's Motion to Suppress concerned the legality of the stop and subsequent search of a Barwood cab in which appellant was an occupant. The search of that vehicle turned up numerous items used or stolen during two armed robberies.

Sergeant Robert Carter of the Montgomery County police department, who was the principal witness at the hearing, testified as follows. At 9:30 p.m. on March 30, 2000 he heard a broadcast reported that Kemp Mill Wine and Beer (Kemp Mill store) had been robbed. At 9:34 p.m., a broadcast described two robbery suspects who had obtained cash and were last seen running into the woods behind the Kemp Mill store: (1) a black male, age 20 to 25, 6' tall, and 220 pounds; wearing a black bandana around his face, all dark clothing, and a hooded sweatshirt; and (2) a black male, age 20 to 25, 5'9" tall, and 160 pounds; wearing all dark clothing and a hooded sweatshirt. Fifteen to twenty minutes after the initial broadcast, another broadcast reported that a Barwood cab occupied by five black males was observed screeching its tires when it left from behind the shopping center in which the Kemp Mill store was located.

At approximately 10:26 p.m., a broadcast reported a second robbery, that of Dominic's Pizza on New Hampshire Avenue, which is located five to ten minutes from Kemp Mill. The robbers were described as two black males armed with handguns, one being larger than the other and wearing dark clothing. They were last seen leaving on foot and one witness heard the racking noise of an automatic. Carter decided to drive to the intersection of Randolph Road and Old Columbia Pike knowing that someone leaving Dominic's Pizza may be likely to pass through that intersection.

Approximately 10:28 p.m., Carter observed a light blue cab traveling eastbound on Randolph Road. The cab, which had Barwood Cab Company markings, was at this point approximately a five to ten minute drive away from Dominic's Pizza. All three of the cab's occupants looked in his direction as he drove past the cab. He observed a driver, a passenger in the front seat, and a passenger in the right-rear seat. All were dark skinned and appeared to be wearing dark clothing.

Carter made a u-turn, and fell in behind the cab. At around 10:29 p.m., he notified other units of his position. He noticed that the cab's rear and front seat passengers leaned their "head and shoulders . . . forward beyond the view of the back depth of the cab. . . ." The traffic was light, and he did not normally see many Barwood cabs with fares at that area at that time of the evening.

The cab stopped for a red light at the intersection of Randolph Road and Route 29. At this point, the cab was in the passing lane. When the light changed, the cab proceeded through the light. Without violating the speed limit, the cab jerked from the passing lane into the right lane, as "if somebody had taken the steering wheel and grabbed their hands all the way at the bottom so they could make a complete revolution with it and snap the car suddenly into the slow lane." The cab proceeded at the speed limit. As it reached Calvert Boulevard, it made another lane change, like the first, but from the right lane into the passing lane. After traveling through the intersection, the cab made another lane change

into the right lane in the same manner as the first two. Carter could not remember if turn signals were used. The lane changes did not interfere with any other vehicles because at this time, other than Carter and the cab, no other vehicles were in the area.

During these lane changes, Carter was approximately three car lengths behind the cab. As the cab changed lanes, he similarly moved his vehicle between lanes. He did not observe the cab's occupants look in his direction during the time when the cab repeatedly changed lanes. He thought that "it was also significant that nobody looked behind."

After the cab's third lane change, Officer Eric A. Mason joined Carter, and they decided to stop the cab to conduct an investigative detention. At this point, the officers were a quarter of a mile away from the Prince George's County line. Carter concluded that he had probable cause to believe that the cab's occupants were suspects in both robberies. He announced to the other officers that they were not going to do a felony stop, but a "high alert" stop.[2] He decided to make a "high alert" stop "because we were stopping this car in conjunction with a lookout for two armed robberies where a Tech 9 or Uzi had been described."

After Carter activated his emergency equipment, the cab almost immediately increased its speed by five to ten miles per hour. Although Carter activated the emergency equip-

---

2. Carter described a "high alert" stop as a stop where officers have their guard up and are very cautious when approaching the car. Carter made up the term "high alert" stop on the night in question. He described it as a situation where

we want to stop a car and we don't want to order people out at gunpoint and lie them out prone out on the street, that is our felony stop, but yet, we don't want to meander up to the car either and say hi, I am Seargeant Carter. I stopped you for speeding. I need your license and registration.

So it is that in between condition where we want to be cautious yet not have anybody pruned [sic] and I don't know if you necessarily want to put—there is no label that you can stick on it, but it is not—it is not an unknown traffic stop and it is not a felony stop. It is somewhere in between.

ment in Montgomery County, the cab stopped approximately ten seconds later in Prince George's County. Three additional officers joined Carter and Mason.

After the cab stopped, Carter yelled to its occupants to put their hands up. The two front passengers immediately complied, but appellant, the rear passenger, did not. Carter heard "a clunk." The officers approached the cab with their guns drawn. Suddenly, the rear passenger door flung open and appellant got out. Carter instructed appellant to get back in the car. At this point, Carter observed (1) a "large chunk of wadded up cash" falling out of the pocket of appellant's sweatshirt, and (2) an "inter-Tech 9 submachine pistol lying on the [taxicab's] rear floorboard." The officers arrested the cab's occupants and conducted a search of the vehicle that turned up numerous evidentiary items associated with the robberies.

Officer Mason testified as follows: He responded to the armed robbery at the Kemp Mill Shopping Center at approximately 9:30 p.m. At that location, he heard citizens report that they had seen a Barwood cab in the rear of the shopping center. He subsequently found himself in the same locale as Carter at approximately the time Carter decided to make a u-turn and follow the cab. Mason got caught up in traffic and was somewhat behind Carter. He opined that it was not unusual to see a cab occupied or unoccupied with passengers of any race or nationality in that area of Montgomery County and time of evening. While following the cab, he observed the cab move from the right lane to the passing lane and then back over to the right lane. He described the lane changes as "done slowly," but noted that the driver appeared to be confused as to what lane he wanted to be in and the driving was "kind of erratic."

Daryl White, a Barwood Cab Company employee, testified that (1) it was not unusual for cabs to run calls in the area of Montgomery County where the cab was observed, and (2) the vast majority of Barwood cabs fit exactly the same description as the cab in question.

Judge Thompson found the officers had probable cause to stop the cab,[3] concluding as follows:

The issue then becomes what was the right of the police to stop the vehicle. There are two possibilities upon which this stop could have taken place, the first of which the Court will address, what might be called the misdemeanor activity and this is based not entirely upon the testimony of Sgt. Carter of the Montgomery County Police Department who was in surveillance to the rear of the Barwood cab.

He alleged that the vehicle was driven in a manner which was—there was significant sudden lane changes without apparent reason three times before the stop was effected, that in his opinion the driver of the vehicle was acting negligently and that the car when it was approached by the marked police cruiser but its emergency equipment was illuminated the vehicle did not immediately stop and therefore there may well be a basis to effect a stop on fleeing and eluding from a police officer.

Taking it one by one, the Court does not find that the rapid changes of lanes constitute illegal lane changing. There is nothing in the code that suggests that that constitutes a violation of law as long as it does not jeopardize or threaten other drivers on the roadway and does not appear to be reckless or create some other type of traffic violation.

Whether it is negligent driving, that is in the Court's mind defined as the failure of a driver to do that which he ought to do or the doing of something that he ought not to have done on a negligent basis.

Here the complained activity is intentional and the Court once again finds that it is not a negligent act on the part of the defendants and accordingly cannot form a basis.

---

**3.** Carter never issued a traffic citation for any traffic violation. He acknowledged that the first time he described the cab's operation as negligent driving was at his State's Attorney conference before the Grand Jury presentation. At the suppression hearing, the State contended Carter's subjective reasons for stopping the car correlated with the armed robberies' broadcasted lookouts. It also maintained that the cab driver's objective conduct constituted negligent driving.

Finally, the fleeing and eluding is one which with all due respect to Office[r] Carter and Officer Mason, it appears that the stop was effected even though it may not have been effected absolutely immediately and that as a result the Court does not find that there was a fleeing and eluding that it was just a failure to stop.

It is a fine line between those two things, but at this point I don't believe that the stop was justified by the traffic activity of the defendants.

That allows us to turn to what frankly I consider the heart of the issue here and that is whether or not there was articulable suspicion or reasonable cause to suspect that a crime had been committed and therefore the officers were within their rights to make the stop.

Now the defendants complain that the stop did not fall within the context of 602(a) which is fresh pursuit intrastate. To briefly read the section it says that fresh pursuit under Section (a) means pursuit under the circumstances listed in Section (c) of this section and this pursuit shall be continuous and without unreasonable delay but does not require instant pursuit. In determining if the pursuit meets these elements, the Court shall apply [the] requirements of common law definitions of fresh pursuit which pertain to these elements.

I find that it was fresh pursuit. Under the circumstances provided in section (c) a law officer may arrest a person anywhere in this state and hold that person in custody and, two, return the person to the jurisdiction in which a court has proper venue for the criminal offense alleged to have been committed by that person.

That is not really an element here about which there is a complaint. Section (c) which states that the circumstances under which the authority may be exercised. A law officer may engage in the fresh pursuit of a person and exercise the authority provided by section (b), which is to arrest and bring somebody back, if the person has committed or is reasonably believed by the law enforcement officer to have committed a felony in the jurisdiction in which the law

enforcement officer has the power of arrest and, two, has committed a misdemeanor in the presence of the law enforcement officer in the jurisdiction in which the law enforcement officer has the power of arrest.

Now I will note that subsection (c)—I have already eliminated number two as a basis. Subsection (1) says has committed or is reasonably believed by the law enforcement officer to have committed a felony.

The defense has raised the issue of whether that equates to probable cause. The Court chooses to give it the meaning that it says exactly in the statute, which is reasonably believed, which allows the Court to examine Sgt. Carter who made the key decision as to what he reasonably believed at the time to see whether the statute was complied with.

Finally, I note that (b) does not make any reference at all to a search. Now this could be Murphy Brown but it does refer to an arrest and I think the state has argued that this was an investigatory stop, not an arrest. The defense has said that it has to be an arrest given the emphaticness of the arrest and the takedown.

The Court is not persuaded necessarily that it was a final arrest so the question is did the police have probable cause, and we have had lots of discussion about that.

In determining whether there was probable cause, the easiest way to begin is to see what it is that was the operative information available to Sgt. Carter at the time that he made the decision to stop the vehicle.

I know that he made the decision to stop the vehicle well before the stop was actually made and possibly even before some of the alleged traffic offenses occurred and I really think that the decision had been made based on what he knew and he didn't really dwell long on the traffic activity.

Let me go over the criteria and the ones which I find actually took place as a matter of fact and the degree of credibility or reliance to place on it.

Officer Carter cited 16 criteria of which one was traffic conduct, so looking at the other 15 criteria that he says were

the basis of probable cause, two armed robberies within an hour's time.

There is no question that in fact that is—less than an hour apart, approximately 50 minutes apart as the Court recalls the testimony—that the locations are within five to ten minutes drive of one another. The Court finds that there is in fact the case depending upon the time of day and the volume of traffic between 9:00 and 10:00 o'clock at night I think it is entirely possible that these locations are within five to ten minutes drive of each other, but also and more importantly whether or not Dominick's was within five to ten minutes of the first seeing of the defendants in the Barwood cab in which they were located.

The Court finds that that time estimate of the distance is appropriate and I would observe and take judicial notice that these events took place—the first event took place just to the west of the Paint Branch geographical or topographical division in southeastern Montgomery County that generally separates the far eastern area of the county from the northern Silver Spring area, the second east of that location and the third place where Sgt. Carter picked up the trailing was to the northeast. [APPELLANT'S TRIAL COUNSEL] refers to it as a north-south line and the Court finds that it is really a southwest-northeast road, and that Randolph Road is east-west road. Anyway, that is a consistent element.

He says they were both beer and wine establishments, and the Court also find[s] that that is a consistent element. It is not whether one sells pizza and whether one sells beer and wine but whether or not they both have the same nature and characteristic.

I would accept this even if one is an on-off sale location and the other simply sold off premises. They are both, as I think the state has correctly observed, establishments within shopping centers and are cash and carry operations and they are places that may well have been frequented by the same people and a police officer would assume and I think reasonably that they are both the easy kind of hits that can

be made and when they come in within 50 minutes of one another it might be reasonable to assume that there is a some connection between the two.

Now how much connection, obviously further investigation has to prove out and develop, but certainly they are not so diametrically opposite of one another, such as a break-in of somebody's garage and a bank robbery or something of that nature. These are more similar than they are different, let's put [it] that way.

Both armed robberies involved two black males who are armed and were wearing dark clothing. Yet again more similarities of incidents one and two.

Their faces were concealed and I think there [sic] establishes a general modus operandi for the robberies that took place and that a reasonable police officer could conclude that they were related to one another and the fact pertaining to one were facts pertaining to the other.

The next factor that he looked at was that within 20 to 30 minutes of the first robbery he learned of four to five black males in a Barwood cab screeching off from behind the scene of the original robbery.

Now significant in that is that he learned of the information fairly early on, that it involved an unusual vehicle, not unique but unusual, a Barwood cab. There are a limited finite number of Barwood taxicabs as opposed to in the Cartnell [sic] case where they were saying Japanese car. I think there is a huge distinction and I think the state was correct when they observed that and I agree with that.

That it contained four to five black males. Now that particular element is less trustworthy because it obviously differs from what Officer Carter later observed, but I think it is reasonable for a police officer to say I don't know how good the eyewitness testimony was.

The [sic] cuts both ways. It could mean that the witness was good or not good but whether or not four to five were in the car or three were in the car is an observation that—any reasonable officer I think would be circumspect about rely-

ing solely upon the number unless there were some other indicia.

There is also another alternative which is that one or two of the individuals involved could have gotten out of the cab. We don't know. There is no evidence of that one way or the other but that is certainly a hypothesis that a reasonable police officer could have consider[ed], so I don't find that four to five black males in the cab is an excluding characteristic. Finally, the fact that the cab bolted away from the scene is I think of significant importance. Cabs rarely screech away from anywhere. If anything, they frustrate drivers by cutting in front of people and not screeching away. This was in back of an establishment and creates an aura of suspicion in and of itself.

Now the victims described one large robber and one small robber. Carter referred to that as Laurel and Hardy concept. He also knew that the robbers were younger as opposed to older men.

Finally, that the location of the cab when he first saw it corresponded in time and location to the robbery. In other words, what he said was the fact that he saw a cab at Old Columbia Pike and Route 29 and Randolph Road, in that general area, was not a physical impossibility to be related to the second robbery.

Obviously the first robbery, and Cartnell [sic] really speaks to this, happened far enough that in 50 minutes this Court would observe that the culprits could have gotten to Baltimore and been there or into D.C. or any other location, but certainly it corresponded as to the second robbery.

As I have indicated, there is a basis on which to relate these two robberies together.

Now at this point in time, Officer Carter testifies he was traveling westbound on Randolph moving at about five miles per hour and that the Barwood cab that he observed was moving at about 30 miles per hour and moving eastbound on the same location, and that he looked at the passengers in the cab and the cab passengers looked at him.

The Court finds that as I think [counsel] correctly pointed out absolutely nothing unique about that. I think every time I pass a police officer I look to see what he is doing. Of course I have a different position than a lot of the public, but certainly I think we are all curious about the actions of the police and I don't find that to be particularly helpful in the analysis of whether or not these individuals were involved.

He then states that after he made a U-turn and pulled up behind the vehicle while it was stopped for the traffic light at Randolph and Route 29, the passengers, the right front passenger and the rear passenger, ducked down and their conduct was furtive.

The Court I think on the facts of whether they ducked down or lowered themselves finds that that is in fact what Sgt. Carter saw. Whether it constitutes furtive activity or not is a subjective analysis. It is an area frequently subject to police abuse when they are seeking to bolster probable cause the Court declines to make any judgment about whether ducking down constitutes furtive behavior beyond just simply that they ducked down at a traffic light, either to deal with something on the floor or possibly the more sinister interpretation to not be observed.

At this point, Sgt. Carter testified that he also noted the often lane changes. Whether this constitutes a violation of law is one thing, but whether it constitutes an additional element of conduct that adds to probable cause is another thing.

Obviously the lane changes are peculiar driving conduct if there is no need to change lanes and I think Officer Carter was entitled to factor that into his analysis.

He also stated that he noted that there was a passenger in the front of the cab, and I think under cross-examination noted that that is not unknown in cab traffic, but I will say that I think it is certainly something that gives pause and allows you to look at [and] think more about what the cab is being used for and whether it is on or off duty and whether

it is really transporting passengers ... or is it being involved in some other activity.

Finally he said that there are few cabs north of Silver Spring in the evening hours. The Court finds that there is some merit to that.

There was testimony by the management of the cab company that there are times when it is very difficult to get cabs to service this area and that cabs—I think the police have a very good idea of whether cabs are generally available and where they hang out if for no other reason than because they are charged with the protection of cab drivers in dangerous area[s], not to suggest that north Silver Spring is necessarily a particularly dangerous but there having been a murder there I think they were alert to that and I think that does factor into the consideration of what was this cab doing there if it was there for some other reason than because it was involved in the illegal activity.

Now one additional factor. I will say that this factor occurs after the decision is made to stop the car. I am not saying to arrest anyone or to search anyone or to do anything, and that is that the car when the police officers illuminated their lights did not pull over but actually accelerated somewhat before it was forced over by Officer Mason.

When the stop takes place, Officer Mason does not make the decision to make the stop. The quantum is not measured by what Officer Mason had in his mind. He followed orders. He may have come to conclusions that were different than Officer Carter and his judgments are not controlling.

Rather, it was the decision by Sgt. Carter and the Court observes that the development of these elements are a continuum and that when the car did not pull over that may further reinforce Carter's decision when he might have said to Mason we want to make this stop but this is a traffic stop and we want to do it as a traffic stop.

Instead he elected to say—I have forgotten the words—that this was a high alert stop meaning that they had to be very alert because of the circumstances.

Mason knew because he had helped to investigate at least one of these robberies, he knew of the possibility of automatic handguns having being used.

Now we get to the point that [APPELLANT'S TRIAL COUNSEL] wanted to argues a little bit further and that is that as the police officer went to the rear of the car Mr. Farewell get out of the car and almost simultaneously Officer Mason went to the front of his car and pointed his pistol and threatened to blow the head off of Mr. Tyler.

When Mr. Farewell steps out of the car and Sgt. Carter comes up and says whoa, whoa, where are you going, that is when Mr. Farewell tried to step out of the car with his hands up and he got back in with his hands down and said he was catching a cab ride home and Officer Carter testified it seem[s] disingenuous to him and that it increased his suspicion.

However, certainly Mr. Tyler had every reason to believe he was under arrest. Mr. Owens was slow putting his hands up but did so I think slowly.

Thereafter, Officer Carter observed the gun and then a formal arrest took place. Working backwards, since the gun was seen, probable cause exists.

Before the gun was seen, there was an abundance of money and probable cause exists.

The Court finds that from the continuum and quality and quantity of the various elements cited by Officer Carter in which the Court has confidence, probable cause existed. Whether it is called articulable suspicion or probable cause, the Court finds that it constituted probable cause.

I put great reliance on the narrowness of the suspicion, that is that there was a Barwood taxicab involved, that there were black males involved, some undetermined number—a determined number of four and five but there were three in the cab at the time of the stop and I don't find that

to be to troublesome at all, and that the robberies had some identify [sic] with one another, that the appearance of the occupants of the cab to the extent that they could be perceived by the officers was consistent and not inconsistent with the appearance of the robbers.

Now whether or not one was large and one was small I think is problematic. I think you can tell people sitting in a car are bigger or smaller than one another but I have some question whether Carter could really tell right at that moment as he passed.

In any event, with probable cause existing, the mandate that is set forth in the appellate law in the State of Maryland appears to the Court to have been met by the police in this instance and accordingly the Court declines to suppress the search of the vehicle. It is certainly justified as part of a search incident to an arrest and a Terry stop and the like.

The specificity of the search which at least defendant Tyler complains I think is merit less. Those items—first of all, not all the items in the car were seized but certainly the items that have been identified by the Court in my summary here all seem to have either direct relevance to events or could possibly lead to directly relevant evidence that I think the police at the time, knowing what the[y] had at that time, had a right to seize until they could further investigate things.

What ultimately the Appellate Courts ask of the trial court is to make factual determinations and then to balance whether the intrusiveness that has occurred is warranted by the facts that were known by the police.

The Court finds that the facts known by the police absolutely warranted the stop of this vehicle and that it was not as described by Officer Mason a mere hunch and that Officer Carter certainly articulated a number of considerations.

Now there is no question in the Court's mind that in hindsight, looking back, that police seek to justify their

searches by identifying articulable criteria for searches and what we have to do is look closely to the facts at that time, which is what the Court has attempted to do, as opposed to just accepting carte blanche the allegations of Officer Carter.

As I have said, I have some doubt about some of the things that he testified served as a basis for the act, but I do not think he was acting on a mere hunch and I think the stop was proper.

## The Trial

During the appellant's jury trial, he called Joseph Danell Owens as a witness. Although Owens was charged as a co-defendant, he waived his Fifth Amendment rights and testified as follows. He, appellant, and Joseph Tyler (the third occupant of the cab), picked up two Spanish males at some point before the police stopped the cab. Thereafter, but prior to the police stopping the cab, the two Spanish males got out of the cab, apparently leaving various evidentiary items in it.

During cross-examination, the State used a statement made by Tyler. Over appellant's objections, to "refresh" Owens' memory, the State showed him Tyler's written statement. The prosecutor's remarks made it clear to the jury that Tyler's statement was inconsistent with Owens' testimony. At the end of Owens' testimony, the State moved to introduce Tyler's statement into evidence, and then withdrew the request when appellant objected. The court declined to give a jury instruction indicating that the use of the statement was error.

## I.

Appellant argues that, because Judge Thompson erred in concluding that the stop of the cab passed Fourth Amendment muster,[4] the evidence seized was tainted fruit of

---

**4.** "The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures, including seizures that

an unlawful stop. From our independent review of the record, we are persuaded that there is no merit in this argument.[5]

## The Stop, Arrest, and Search Incident Thereto

 It is fundamental, under Federal and Maryland jurisprudence, that the detention of a motorist pursuant to a police traffic stop is a seizure encompassed by the Fourth Amendment.

\* \* \*

 A number of legal theories can justify motorist seizures, including the execution of a valid warrant or warrantless situations harnessed by probable cause, such as traffic violations or evidence of criminal activities. *See generally In re Tariq A–R–Y,* 347 Md. at 490–91, 701 A.2d at 693–94; [Plevon v.] *Pryor,* 122 Md.App. [671] at 678–82,

---

involve only a brief detention." *Stokes v. State,* 362 Md. 407, 414, 765 A.2d 612 (2001) (footnote omitted). It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The protections of the Fourth Amendments apply to the State of Maryland through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

5. In reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing and not the record of the trial. *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999); *In re Tariq A–R–Y,* 347 Md. 484, 488, 701 A.2d 691 (1997). In considering the evidence presented, we extend great deference to the hearing judge's fact-finding in respect to determining the witnesses' credibility and weighing and determining first-level facts. *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990). When conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that his findings are clearly erroneous. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). But, as to the ultimate conclusion, we must make our own independent constitutional appraisal by reviewing the law and applying it to the facts. *Riddick,* 319 Md. at 183, 571 A.2d 1239; *Perkins,* 83 Md.App. at 346, 574 A.2d 356. Finally, "we are required to accept, as presumptively true, that version of the evidence, and all inferences that can reasonably be squeezed therefrom, most favorable to the prevailing party." *Graham v. State,* 146 Md.App. 327, 341, 807 A.2d 75 (2002).

716 A.2d [338] at 342–44. Absent a warrant or probable cause, the forced stop of a motorist may be had under the Fourth Amendment when the police officer is "able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion." [FN4] *Ferris,* 355 Md. at 384, 735 A.2d at 506. The Supreme Court has held that this standard can be constitutionally applied to seizures based on suspicion of past criminal activity. *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604, 612 (1985). *See also Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984); *Pryor,* 122 Md.App. at 679, 716 A.2d at 342 (noting that "it is well settled . . . that the forcible stop of a motorist may be based on reasonable articulable suspicion that is insufficient to estab-lish probable cause"). Under such circumstances, the police are permitted to stop and briefly detain a person to investi-gate the suspicion. *See Derricott [v. State],* 327 Md. [582] at 587, 611 A.2d [592] at 595.

*Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000).

 No litmus test exists to define what constitutes "reasonable suspicion." *Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). The Supreme Court of the United States, however, has stated that "the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). And the level of proof necessary to establish reasonable suspicion " 'is considerably less than proof of wrongdoing by a preponderance of the evidence' " and " 'obviously less demanding than that for prob-able cause.' " *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086 (1990) (quoting *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). A determination of reason-able suspicion must be made on the basis of the "totality of the circumstances." *United States v. Arvizu,* 534 U.S. 266, 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). Two factors, quantity of the information the police possessed, and the quality or

reliability of that information, must be examined under the "totality of the circumstances" [6] to determine whether reasonable suspicion existed. *Cartnail,* 359 Md. at 287, 753 A.2d 519 (citations omitted).

To determine whether a stop was based on reasonable articulable suspicion, the Court of Appeals has looked to Professor LaFave's "reasonable suspicion factors," which examine:

(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspi-

---

6. In *Cortez,* 449 U.S. at 418, 101 S.Ct. 690, Chief Justice Burger explained the two part "totality of the circumstances" test:

First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain commonsense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio, supra,* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] said that "[this] demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*"

(Citations omitted).

cion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation. *Id.* at 289, 753 A.2d 519 (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(g), at 195 (3d ed. 1996 & 2000 Supp.)). In the case at bar, under the totality of the circumstances, the police had reasonable suspicion to stop the cab in order to perform an investigative detention of its occupants.[7]

 We agree with Judge Thompson that it is a reasonable inference to conclude that the two robberies were connected. The two robberies occurred in the same general location, the establishments robbed were located five to ten minutes apart; the robberies occurred close in time, approximately fifty minutes apart; both establishments were in shopping centers and were "easy hits," being that they were cash and carry operations; and both lookouts described the suspected perpetrators as two black males wearing dark clothing.

It was also logical to believe that the Barwood cab observed near the location of the first robbery may have been utilized in the second robbery. The cab allegedly had screeched its wheels behind the shopping center in which the Kemp Mill store was located. As this conduct was suspicious under the circumstances, it was reasonable to conclude that the robberies may be connected and that a Barwood cab may have been used in both robberies.

Application of LaFave's reasonable suspicion factors leads to the conclusion that the police had reasonable suspicion to stop the cab. The robbers were described as two black males wearing dark clothing. One suspect was larger than the other. The persons in the cab were black males wearing dark clothing. Although Judge Thompson did not find it significant, Carter testified that the man occupying the front passenger seat was considerably larger than the man in the back seat of the cab.[8] Significantly, a Barwood cab was suspected to have

---

7. Despite appellee's assertion, the record does not indicate that the driver of the cab committed a traffic violation that would justify a stop.

8. We recognize that there is a discrepancy in the number of persons involved, and that the first lookout described one of the robbers

been involved in the robberies and the police stopped a Barwood cab.

Carter spotted the cab approximately two minutes after the second lookout was broadcast. The cab's location at that time was only a five to ten minute drive from Dominic's Pizza. Thus, the distance that the robbers could have fled was not great, and the location in which Carter spotted the cab comported with the distance that the cab could have traveled after the second robbery.

At the time Carter viewed the cab, the traffic was light. When Carter fell in behind the cab, he and the cab were the only vehicles traveling in the direction of Prince George's County. Additionally, Carter did not usually see Barwood cabs with fares at that time and area of Montgomery County.

It was entirely reasonable for the police to consider the probable direction of the robbers' flight. Carter testified that, because Dominic's is "on a main thoroughfare with no egress through any of the neighborhoods," the offenders had to travel through one of two places to leave the area. One possible route was to take New Hampshire Avenue north and then take Randolph Road east or west. Carter explained that if the robbers had chosen Randolph Road, one of the intersections they would have to pass through was Randolph Road and Old Columbia Pike. It was on Randolph Road that he spotted the cab.

The cab's driving also appeared unusual. While the lane changes were not illegal, it was unusual for a driver to make three sudden or "erratic" lane changes for no apparent reason when Carter and the cab were the only vehicles in the general vicinity. Judge Thompson commented that one could question if the cab was on duty because one of the cab's occupants was

wearing a black bandana around his face. However, there may have been two people involved in the robberies and one person driving the getaway car. Someone involved in a robbery would most likely take the earliest opportunity to remove a bandana that had been covering his face.

in the front passenger seat. Two of the cab's occupants hunkered down out of view after Carter fell in behind the cab.

Finally, a Barwood cab was reported leaving the area in which the first robbery occurred. The first robbery occurred approximately fifty minutes prior to the second robbery. After spotting the cab less than hour after the first robbery and near the scene of the similar second robbery, it was reasonable to suspect that the cab might have been the same one involved with the first robbery.

This case is clearly distinguishable from *Cartnail, supra*,[9] and *Stokes, supra*,[10] in which the Court of Appeals held that reasonable suspicion did not exist. In contrast to *Cartnail* and *Stokes*, the officers had reasonable suspicion to stop the

---

**9.** In *Cartnail*, the information indicated that three black males had fled the scene of an armed robbery driving a gold or tan Mazda. 359 Md. at 277, 753 A.2d 519. An hour and fifteen minutes later, the police stopped a gold Nissan occupied by two black males in a different part of the city. *Id.* at 277–78, 753 A.2d 519. The court found that the only factors matching the appellant's particular circumstances were "gender, race, and arguably the color of the car." *Id.* at 293, 753 A.2d 519. The fact the State had stopped a Japanese car also did not sufficiently narrow the "seemingly infinite combinations of drivers" from the universe of all drives who could have left the location of the robbery. *Id.* at 293, 753 A.2d 519. Additionally, the court found that range of flight after an hour and fifteen minutes was "relatively enormous." *Id.* at 295, 753 A.2d 519.

**10.** In *Stokes*, the lookout was for a black male wearing a black t-shirt who was allegedly involved in a robbery that had occurred near where an officer was parked. 362 Md. at 410, 765 A.2d 612. Within thirty minutes, the petitioner pulled into the same parking lot at high rate of speed and parked diagonally across several parking spots. The driver immediately turned off the engine and got out of the car. He was wearing dark clothing, a black jacket, dark pants and a skull cap. *Id.* The officer stopped the individual and performed a pat down yielding contraband. *Id.* at 411, 765 A.2d 612. The Court concluded that (1) the description of the robber was sparse and too generic; (2) no car was allegedly involved in the robbery; (3) the time and spatial relation to the stop did not comport because a half an hour after the robbery it would be unlikely the robber would be such a short distance from the crime; and (4) any possible suspicion dissipated when the suspect parked near the marked police cruiser. *Id.* at 424–27, 765 A.2d 612. The Court held that the officer did not have reasonable suspicion to stop and frisk the suspect.

cab.[11] It was a reasonable inference to conclude a Barwood cab may have been involved in both robberies. The police stopped a Barwood cab, in one of very few areas in which the robbers could have fled by vehicle, after the cab made unusual lane changes. The cab's occupants fit the general description of the robbers: black, male, and wearing dark clothing. Carter stated Barwood cabs with fares were not common in that area. The time at which the cab was spotted comported with the distance that the cab could have traveled after Dominic's was robbed. We therefore agree with Judge Thompson's conclusion that the officers had reasonable articulable suspicion to effect the stop.

When Carter observed appellant exit the vehicle, a wad of cash fall out of appellant's sweatshirt, and the Tech 9 on the cab's floor, the officers had probable cause to (1) arrest the cab's occupants, and (2) search the cab under the "search-incident to arrest" exception to the warrant requirement.[12]

---

11. We also disagree with appellant's argument that this is a situation like *Graham v. State*, 146 Md.App. 327, 807 A.2d 75 (2002). In *Graham*, an officer sought to justify a stop and warrantless search under the guise of conducting a routine "field interview." *Id.* at 357–68, 807 A.2d 75. The State conceded that the officer had no articulable suspicion of any wrongdoing. *Id.* at 357, 807 A.2d 75. The *Graham* Court cautioned against creating terms of art like "field interviews," which might somehow enjoy an enhanced constitutional status in law enforcement officers' minds. *Id.* at 364–68, 807 A.2d 75. This status thereby permitting officers to forgo establishing the prerequisite reasonable suspicion before conducting a stop and frisk. Accordingly, the Court stressed the importance of establishing reasonable suspicion before a stop and frisk is conducted. *Id.* at 362–64, 807 A.2d 75.

Unlike *Graham*, in this case, the police had a reasonable suspicion prior to stopping the appellant. Although a warrantless stop not based on reasonable suspicion can never be justified by an officer's decision to simply conduct a "high alert stop," it is clear Carter used the term only for safety purposes stressing the importance of using caution. Given that handguns were reportedly used and one witness heard the "racking noise of an automatic," Carter's concern for the officers' safety was reasonable.

12. *See New York v. Belton*, 453 U.S. 454, 460–61, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (holding officers may search an automobile's entire passenger compartment after a lawful arrest).

Judge Thompson properly denied appellant's Motion to Suppress.[13]

## II.

Appellant argues that the court erred in allowing the prosecutor to reveal statements made by Joseph Tyler, a nontestifying co-defendant, during the cross-examination of Joseph Owens. According to appellant, by pretending to refresh Owens' memory, the prosecutor effectively introduced Tyler's statements to the jury. The prosecutor thereafter attempted to move the statement into evidence, highlighting its importance to the jury.[14] We agree that the court erred.

---

**13.** We also agree with Judge Thompson that the officers had authority under the Code to pursue the cab into Prince George's County. Judge Thompson relied on Md.Code, Art. 27 § 602A to make this finding. This section has been repealed and "Fresh Pursuit—Intrastate" is now found in Md.Code (2001), § 2-301 of the Criminal Procedure Article. The pertinent provisions of § 2-301 provide:

(a) Scope of section.—This section applies to a law enforcement officer of a jurisdiction in the State who engages in fresh pursuit of a person in the State.

(b) Elements of fresh pursuit.—

(1) Fresh pursuit is pursuit that is continuous and without unreasonable delay.

(2) Fresh pursuit need not be instant pursuit.

(3) In determining whether the pursuit meets the elements of fresh pursuit, a court shall apply the requirements of the common law definition of fresh pursuit that relates to these elements.

(c)Conditions for fresh pursuit.—A law enforcement officer may engage in fresh pursuit of a person who:

(1) has committed or is reasonably believed by the law enforcement officer to have committed a felony in the jurisdiction in which the law enforcement officer has the power of arrest;

or (2) has committed a misdemeanor in the presence of the law enforcement officer in the jurisdiction in which the law enforcement officer has the power of arrest.

(d) Authority of officer engaged in fresh pursuit.—A law enforcement officer who is engaged in fresh pursuit of a person may:

(1) arrest the person anywhere in the State and hold the person in custody; and

(2) return the person to the jurisdiction in which a court has proper venue for the crime alleged to have been committed by the person.

**14.** Appellant contends that these actions were in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *Gray*

During appellant's defense, he called Owens to provide exculpatory testimony. The following transpired during Owens' cross-examination:

Q [THE PROSECUTOR:] All right, I am going to show you a document that is being marked State's Exhibit No. 70, and specifically I am drawing your attention to a transcript that has been marked—on page 20 of a transcript—I think it has the name "Mr. Tyler" on it.

I want you to read it to yourself from line 15 down to 23. Read lines 15 to 23 to yourself, and I am going to ask you if that does not refresh your memory of where you actually in fact did change any positions in that cab.

A To my understanding of what Mr. Tyler said, this was a forced statement.

THE COURT: Just read it—

BY THE PROSECUTOR:

Q Read it to yourself.

THE COURT:—and the question to you is, Does it refresh your recollection.

THE WITNESS: I don't know what he's talking about. I have this already, Your Honor—

THE COURT: All right.

THE WITNESS:—in my personal possession.

THE COURT: So it does not refresh your recollection of anything?

THE WITNESS: No, because we were nowhere near this place that he's talking about.

BY THE PROSECUTOR: So you disagree with this information that the actual switch took place by the beer and wine store in Wheaton off of Lamberton Drive?

A It happened on New Hampshire.

After further questioning, the prosecutor referred back to Mr. Tyler's statement, purportedly to refresh Owens' memory:

---

*v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), and *Bowman v. State,* 16 Md.App. 384, 297 A.2d 323 (1972).

Q [THE PROSECUTOR]: Now going back to the discovery that you have—and I am specifically referring you back to State's exhibit No. 70, which is a transcript of Mr. Tyler's statement that you apparently have had and read; is that correct?

Now did it refresh your recollection when you read that transcript, specifically page 7, line 16, that you in fact stopped at Dominic's Pizza Store?

[APPELLANT'S TRIAL COUNSEL]: Your Honor, I object to that.

[THE PROSECUTOR]: Do you want me to show him the line?

THE COURT: Either show him the statement—

[THE PROSECUTOR]: Whatever the Court wants me to do.

THE COURT: Well, I would prefer to have him see the statement in its entirety.

[THE PROSECUTOR]: May I approach the witness?

THE COURT: Yes, you may for that purpose.

[THE PROSECUTOR]: All right.

BY [THE PROSECUTOR]:

Q I want to invite our attention—this is still State's exhibit No. 70. I am referring to page 7. I am going to ask you to read beginning from line 15, which begins with, "Detective Brown, where did you stop?" and the next line, 16— .

[APPELLANT'S TRIAL COUNSEL]: Your Honor, I am going to object to this.

THE COURT: He may read to himself from the statement and you may inquire.

BY [THE PROSECUTOR]:

Q Would you read the next sentence.

(Pause.)

THE WITNESS: I never went to Dominic's.

BY [THE PROSECUTOR]:

Q Reading the statement does not refresh your recollection that you actually did in fact go to the pizza store?

A Never went.

Q Reading that statement—read on further. Does it refresh your recollection that when you stopped at Dominic's you actually parked off to the side of Dominic's next to the carpet store?

[APPELLANT'S TRIAL COUNSEL]: Your Honor, I think this is improper. He has indicated that he never went there.

THE COURT: I think he may ask for further clarification.

THE WITNESS: We never went.

THE COURT: No, you have made an objection, I have permitted the question; we are going to go on.

[APPELLANT'S TRIAL COUNSEL]: Thank you, Judge.

* * *

BY [THE PROSECUTOR]:

Q You have read this statement over, haven't you, Mr. Owens? Yes, sir? Out loud. Have you read this?

A What is this now?

Q You have read it before?

A Yes, I read it?

Q All right. And did you read any portion of the statement that related to where you parked when you stopped at the pizza store?

A We never went to a pizza place. I told you that.

Q Did you read anything that stated that?

A We never went to a pizza place.

Q All right. So reading that particular portion of the document did not refresh your recollection that you actually went to the pizza place and parked on the side of the building next to the carpet shop?

[APPELLANT'S TRIAL COUNSEL]: I have an objection, Your Honor. May I approach?

THE COURT: No. I don't want any approaching. The answer is—

[APPELLANT'S TRIAL COUNSEL]: I have a motion to make, Your Honor.

THE COURT: All right, [APPELLANT'S TRIAL COUNSEL], come up here.

(Whereupon, the bench conference follows:)

[APPELLANT'S TRIAL COUNSEL]: I object. I am going to move for a mistrial. This is not a proper predicate. There has been no indication this man lacks memory or certainty about anything he has testified to.

This is improper use of a document under a guise of refreshing someone's recollection. It is not his statement. This is a statement by Mr. Tyler. They were complaining so much yesterday about the letter that I wanted to introduce from Mr. Tyler.

[THE PROSECUTOR]: I think the basis upon which I was doing it is here is [sic] what you said. This is a man who has indicated that he has consumed huge amounts of drugs, he has been heavily drinking. He has told us in some detail what he did on that particular evening.

I have a version of that particular evening that has been supplied to the police on the evening that occurred which is directly in contradiction to what he has said.

I believe in light of the level of consumption and the level of drugs and alcohol he took, I think it would be fair for the State to say, look, you have looked at this; does not refresh your recollection in light of the—

THE COURT: You can show him anything under the sun to ask him if it refreshes his recollection. He just said no.

[THE PROSECUTOR]: I think I am stuck with his answer.

THE COURT: He said no already.

[APPELLANT'S TRIAL COUNSEL]: For the record, he has never indicated that he lacks memory or uncertainty about anything. That is a predicate for refreshing one's recollection.

THE COURT: Motion is denied. Let's move on.

(Pause.)

[THE PROSECUTOR]: Your Honor, with the Court's permission, may I approach? I want to show a specific page and ask the defendant to read some lines to himself.

THE COURT: All right. I want to ask him a question though, first.

[THE PROSECUTOR]: All right.

BY [THE PROSECUTOR]:

Q Isn't it a fact that you, Mr. Owens, are the person who brought the gun that looked like a machine gun into that vehicle originally that evening?

A I don't own a gun. Haven't seen it.

THE COURT: So is your answer to the question no?

THE WITNESS: Correct, it's no.

THE COURT: Okay.

[THE PROSECUTOR]: May I approach, Your Honor?

THE COURT: You may.

BY [THE PROSECUTOR]:

Q I want you to look at page 9 of this transcript. Why don't you just read the entire page. Read the entire page to yourself.

[APPELLANT'S TRIAL COUNSEL]: May I have a continuing objection on this, Your Honor?

THE COURT: No.

[APPELLANT'S TRIAL COUNSEL]: Then I object. I object to the process

THE COURT: All right. Overruled.

THE WITNESS: There's one problem with this because in the beginning of it, it says, "Who asked"—

THE COURT: No, don't tell us anything—

THE WITNESS: I'm sorry.

THE COURT:—about what it says. Does that refresh your recollection, Mr. Owens?

THE WITNESS: No, it doesn't.

THE COURT: All right.

THE WITNESS: Because I had a gun and I have never been at Dominic's before in my life.

[THE PROSECUTOR]: I don't have any other questions.

 At the conclusion of Owens' testimony, the prosecutor moved for the admission of State's Exhibit number 70, which was a transcript of Tyler's statement. Upon appellant's immediate objection, the prosecutor withdrew that request. After the court had instructed the jury, appellant asked the court to instruct the jury that appellee's use of the transcript was improper. The court declined to give any such instruction.[15] The trial court is vested with "broad discretion in determining the scope of cross-examination, and we will not disturb the exercise of that discretion in the absence of clear abuse." *Martin v. State,* 364 Md. 692, 698, 775 A.2d 385 (2001); *State v. Hawkins,* 326 Md. 270, 277, 604 A.2d 489 (1992). Nevertheless, that discretion is not unlimited, and the court must allow the cross-examiner "wide latitude in attempting to establish a witness' bias or motivation to testify falsely." *Id.* (quoting *Merzbacher v. State,* 346 Md. 391, 413, 697 A.2d 432 (1997)).

 There is no merit in the State's contention that appellant did not preserve this issue for our review. Appellant repeatedly objected for two reasons, arguing that the questioning was improper because (1) appellee had not established

---

15. Appellant asked the court
to advise the jury that ... it was [an] improper use of [Tyler's] transcript and that there was no indication by Mr. Owens that he lacked any memory or he lacked any ability to remember or to recall the events that he testified to under oath.
The Court responded: "All right. The Court declines to do that."

Owens lacked memory of the events in question, and (2) the form of the questions was improper.[16]

### Present Recollection Refreshed

 Present recollection refreshed or revived is the use of a writing or object to refresh a witness' recollection so that person may testify about prior events from present recollection. *Askins v. State*, 13 Md.App. 702, 711, 284 A.2d 626 (1971) (citing *Wigmore, supra*, Sec. 758; *McCormick on Evidence*, Sec. 9). The stimulus used to refresh the witness' memory can be almost anything. *See Germain v. State*, 363 Md. 511, 533–35, 769 A.2d 931 (quoting Judge Learned Hand in *United States v. Rappy*, 157 F.2d 964, 967 (2d Cir.1946), "Anything may in fact revive a memory: a song, a scent, a photograph, and allusion, even a past statement known to be false."). The reason for giving an attorney a large amount of freedom to refresh a witness' recollection is because the witness' testimony is the evidence, not the actual stimulus. *Baker v. State*, 35 Md.App. 593, 598–99, 371 A.2d 699 (1977). Accordingly, the stimulus cannot be introduced into evidence by the party that uses it to refresh recollection. *Id.*

 It is true that in some instances counsel may refresh a witness' recollection even when the witness does not admit to any memory failure. *In Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992), a State's witness had testified to a particular address, giving the specific building number. The prosecutor showed the witness a police report, which indicated a different number, and the witness corrected himself. The *Oken* Court held that the trial judge did not abuse his discretion in

---

**16.** We do not agree with the argument that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), and *Bowman v. State*, 16 Md.App. 384, 297 A.2d 323 (1972), require reversal. That argument, moreover, has not been preserved for our review. *Se* e *Newman v. State*, 65 Md.App. 85, 93, 499 A.2d 492 (1985) ("when a party volunteers the grounds on which he relies for his objection, he ordinarily waives all grounds not mentioned, and preserves for review only those stated"). We note, however, that Tyler's statement was never actually received into evidence.

permitting the use of the report because (1) all participants, including defense counsel, believed the witness' testimony on direct was erroneous; (2) it was the witness' revived testimony that came into evidence, not the report; and (3) **"the State did not use the document to refresh Glidden's memory in order to get into evidence otherwise inadmissible evidence, for at no time did the prosecutor ever attempt to introduce the police report into evidence."** *Id.* at 674, 612 A.2d 258 (emphasis added).

In *Germain, supra,* 363 Md. at 536–37, 769 A.2d 931, the Court of Appeals quoted a passage from the United States Supreme Court's decision in *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), noting that while grand jury testimony may be utilized to refresh a witness' recollection,

[i]f the record showed that the refreshing material was deliberately used for purposes not material to the issues but to arouse the passions of the jurors, so that an objective appraisal of the evidence was unlikely, there would be reversible error. **Likewise there would be error where under the pretext of refreshing a witness' recollection, the prior testimony was introduced as evidence.** *Rosenthal v. United States,* 248 F. 684, 686. **But here the grand jury testimony was used simply to refresh the recollection on material facts,** *New York & Colorado Mining Syndicate & Co. v. Fraser,* 130 U.S. 611, 9 S.Ct. 665, 32 L.Ed. 1031, **not as independent affirmative evidence.** *Bates v. Preble,* 151 U.S. 149, 14 S.Ct. 277, 38 L.Ed. 106. **Furthermore, it was not used for impeachment purposes**....

*Socony–Vacuum Oil Co.,* 310 U.S. at 234, 60 S.Ct. 811 (emphasis added).

In *Goings v. United States,* 377 F.2d 753 (1967), the Court of Appeals for the Eighth Circuit held that the government impermissibly used a witness' prior statement under the guise of refreshing a witness' recollection. *Id.* at 758. The government read to its own witness every sentence of an inadmissa-

ble statement and then asked whether the information contained in it was correct. The *Goings* Court stated that,

> if a party can offer a previously given statement to substitute for a witness's testimony under the guise of "refreshing recollection," the whole adversary system of trial must be revised. *The evil of this practice hardly merits discussion. The evil is no less when an attorney can read the statement in the presence of the jury and thereby substitute his spoken word for the written document.*

*Id.* at 760(citation and footnote omitted). The appellate court, therefore, reversed and remanded for a new trial. *Id.* at 763.

In *Elmer v. State,* 353 Md. 1, 724 A.2d 625 (1999), the Court of Appeals noted:

> It is misconduct for a lawyer to inject inadmissible matters before a jury by asking a question that suggests its own otherwise inadmissible answer, "hoping that the jury will draw the intended meaning from the question itself. . . ." C. WOLFRAM, MODERN LEGAL ETHICS, § 12.1.2, at 623 (1986). As to prosecutors, a prosecutor may not ask a question "which implies a factual predicate which the examiner knows he cannot support by evidence. . . ." *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990) (quoting *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir.1976)); *United States v. Meeker,* 558 F.2d 387, 389 (7th Cir.1977); *see also,* NATIONAL PROSECUTION STANDARDS § 77.2, at 211 (2d. ed.1991) (hereinafter PROSECUTION STANDARDS) ("Counsel should not ask a question which implies the existence of a factual predicate which he knows to be untrue or has no reasonable objective basis for believing is true."); AMERICAN BAR ASSOCIATION STANDARDS FOR CRIMINAL JUSTICE, PROSECUTION FUNCTION, Standard 3–5.7(d), at 103 (3d. ed.1993) (hereinafter ABA STANDARDS) ("A prosecutor should not ask a question which implies the existence of a factual predicate for which a good faith belief is lacking."). "A lawyer who has no reason to believe that a matter is subject to proof may not, by pursuing the matter in examining a witness . . . attempt to create the impression that the

matter is factual." WOLFRAM, § 12.1.2, at 623. The problem is that whether the question is answered or not, the jury has been alerted to the fact which the question assumes. *Id.*

*Id.* at 13, 724 A.2d 625.

 In this case, the State impermissibly used Tyler's statement under the guise of refreshing Owens' memory. Owens' testimony was offered to prove that appellant was not at the scenes of the crimes on the night in question. Although Tyler's statement was never formally received into evidence, the clear implication to the jury was that Tyler had told the police that Owens had played a role in the robbery of Dominic's Pizza. The State should not have been permitted to use Tyler's statement to introduce otherwise inadmissible evidence. When the prosecutor moved to introduce Tyler's statement, and then withdrew that motion after appellant objected, the circuit court should have taken appropriate remedial measures. Those remedial measures should have included a curative instruction.

### Harmless Error

 We are persuaded beyond a reasonable doubt that the errors relating to Tyler's statement were harmless.[17] Appellant's theory of the case was that the incriminating evidence had been placed in the back seat of the cab by two Spanish men, who Tyler picked up while he was driving the cab, and who made an abrupt exit from the cab shortly before it was spotted by Officer Carter. Owens testified that appellant was intoxicated, had fallen asleep in the back seat of the cab before Tyler stopped the cab to pick up the Spanish men,

---

**17.** " 'Every error committed by a trial court is not grounds for a new trial. Reversible error will be found and a new trial warranted *only* if the error was likely to have affected the verdict below. . . . If [the error] is merely harmless error, [then] the judgment will stand.' " *Conyers v. State,* 354 Md. 132, 729 A.2d 910 (1999) (quoting 5 LYNN MCLAIN, MARYLAND EVIDENCE § 103.22, at 49). Nevertheless, this error must be harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 656, 350 A.2d 665 (1976).

was asleep during the entire period of time that the Spanish men were in the cab, and was unaware that the Spanish men were ever in the cab. In light of that testimony, which did not explain the cash spilling out of appellant's sweatshirt and/or the incriminating statements made by appellant,[18] we are persuaded beyond a reasonable doubt that there is no reasonable possibility that the State's improper use of Tyler's statement contributed in any way "to the rendition the guilty verdict[s at issue in this appeal]." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

In *Parks v. State*, 47 Md.App. 141, 422 A.2d 384 (1980), Judge Lowe noted that prosecutorial overreaching may require a new trial:

The evidentiary issue in the case before us exemplifies a tendency of some prosecutors who "overtry" their cases intending, perhaps, to err if at all on the side of prudence. But too much is not always prudent. A careful carpenter, for example, will resist the temptation to add that one last nail which will frequently split the board, weakening, rather than reinforcing, the structure he is trying to build. A careful lawyer also knows when to stop hammering, although the hairline fractures are not always immediately apparent.

*Id.* at 142, 422 A.2d 384. In the case at bar, the fractures should have been immediately apparent to the prosecutor and to the circuit court. Having explained why appellant is not entitled to a new trial in the case at bar, we wish to make it clear that a new trial will ordinarily be required when a prosecutor impermissibly uses the pretext of refreshing a witness' recollection in order to present otherwise inadmissible evidence.

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**

---

**18.** The jurors received evidence that after appellant was arrested, he stated that he was thinking about grabbing the gun as the officers approached the cab, and that his "brother had nothing to do with it."