998 A.2d 397

Calvin Almeida KING

v.

STATE of Maryland.

No. 0152, Sept. Term, 2009.

Court of Special Appeals of Maryland.

July 7, 2010.

584

**586**

David Felsen (Greenberg, Selsen & Sargent, LLC, on the brief) Rockville, MD, for appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: *SALMON, MATRICCIANI and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned), JJ.

LAWRENCE F. RODOWSKY, J., Retired, Specially Assigned.

Appellant, Calvin King (King), was convicted in the Circuit Court for Montgomery County on three charges arising out of his possession, while a passenger in an automobile, of a handgun and ammunition. The offenses were: (1) transporting a handgun in a vehicle, in violation of Maryland Code (2002), § 4–203 of the Criminal Law Article; (2) possession of a regulated firearm by a minor, in violation of Maryland Code (2003), § 5–133(d) of the Public Safety Article (PS); and (3) possession of ammunition by a minor, in violation of PS 5–133(d). The Court sentenced King to three years on the first conviction, a consecutive five year sentence on the second conviction, and to five years on the third conviction. The

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

sentences were suspended in their entirety, and King was placed on five years supervised probation.

Following the denial of King's motion to suppress evidence, the case on the merits was tried on the record at the suppression hearing, supplemented by undisputed facts. The only issue on this appeal is whether the circuit court erred in denying the motion to suppress. King's submission is that the warrantless seizure of the handgun and ammunition are the fruits of an unreasonable seizure of his person. We agree and explain.[1]

## Standard of Review

 "In reviewing the denial of a motion to suppress evidence under the Fourth Amendment, we look only to the record of the suppression hearing and do not consider any evidence adduced at trial. *Ferris v. State*, 355 Md. 356, 735 A.2d 491 (1999). We extend great deference to the findings of the hearing court with respect to first-level findings of

---

1. King phrases the questions for review as follows:

 "1. Did the Circuit Court err in concluding that the police encounter with the occupants of a stopped vehicle in which the Officer examined the interior of the vehicle with a spotlight and flashlight, held the driver's license, asserted police authority by asking accusatory questions, and asserted that he had authority to obtain additional police units for additional searches, did not amount to a seizure?

 "2. Did the Circuit Court err in denying the Defendant's Motion to Suppress and determining that a police/citizen encounter did not rise to a seizure when the Officer parked in a manner that blocked traffic, used a spotlight and flashlight to illuminate the interior of the vehicle, asked accusatory questions for five to seven minutes, asserted the authority to bring canine units to search, and held the driver's license, with another officer present?

 "3. Did the Circuit Court err in failing to rule that a reasonable person would not feel free to leave or end an encounter with police when the Officer examined the interior of the vehicle twice with the assistance of external light sources, parked in a manner intended to isolate the vehicle from other traffic, asked accusatory questions for five to seven minutes implying illegal activity, took the driver's license, asserted authority to bring additional police for a search, and refused to accept the initial denial of consent to search the vehicle?"

fact and the credibility of witnesses unless it is shown that the court's findings are clearly erroneous. *Reynolds v. State,* 130 Md.App. 304, 313, 746 A.2d 422 (1999), *cert. denied,* 358 Md. 383, 749 A.2d 173 (2000), *cert. denied,* 531 U.S. 874, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000). Moreover, we view those findings of fact, and indeed the record as a whole, in the light most favorable to the State. *Id.* We review the court's legal conclusions *de novo,* however, making our own independent constitutional evaluation as to whether the officers' encounter with appellant was lawful. *Id.*"

*Daniels v. State,* 172 Md.App. 75, 87, 913 A.2d 617, 624 (2006), *cert. denied,* 398 Md. 314, 920 A.2d 1059 (2007); *see also Reynolds v. State,* 130 Md.App. 304, 311, 746 A.2d 422, 425 (1999) ("[W]e consider, upon our review of the denial of the motion to suppress, only that version of the testimony in the light most favorable to the State and accepted by the motions judge."), *cert. denied,* 358 Md. 383, 749 A.2d 173, *cert. denied,* 531 U.S. 874, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000).

## The Facts

At the suppression hearing, Officer Michael Chindblom testified for the State and presented the following facts. He is a seven-year veteran of the Montgomery County Police Department. On July 17, 2008, he was patrolling in the area of Thompson Road and King House Road. About 12:15 a.m., he received a dispatch reporting an anonymous complaint about the flickering of a lighter emanating from a dark-colored sedan, with unknown occupants, in an unlit portion of Thompson Road. In his marked police vehicle, Officer Chindblom approached the sedan, which was parked with the driver's side to the curb. He parked the cruiser essentially perpendicular to the front passenger side of the sedan. At no time had he activated his emergency equipment, but he did shine the cruiser's spotlight into the passenger compartment of the sedan. He noticed the driver bend over, apparently placing something under his seat. Officer Chindblom exited his vehicle and radioed for backup. He approached the sedan, shining

his flashlight into the car. Approximately one to two minutes after Officer Chindblom had arrived on the scene, Officer Rebecca Shannon arrived in another marked police vehicle. The police units did not block in the sedan. Officer Shannon stood to the rear of the sedan on the passenger side and kept its occupants under observation.

There were four persons in the parked car. One Abbie McBride (McBride) was in the driver's seat. King, then age eighteen, was seated in the left rear passenger seat behind the driver. Two females were seated in the right passenger seats in the front and rear of the vehicle, respectively. Officer Chindblom stated that the driver appeared nervous and was staring at the floorboard. In response to the officer's questions, McBride stated that there was nothing illegal in the vehicle and that the occupants were simply smoking cigarettes and talking. The officer did not detect the odor of any illegal substances, nor did he observe any illicit paraphernalia. During this questioning, Officer Chindblom requested and obtained McBride's license. He ran a license and warrant check from his personal radio without returning to his vehicle. He could not guess how long it took to get the answer back, but acknowledged that it "usually takes a while to get a return back."

Officer Chindblom continued questioning all of the occupants. He never returned McBride's license, even after the check came back clean. Officer Chindblom informed the occupants that he was requesting a canine unit to search for narcotics. On cross-examination, he testified as follows:

"Q When you ask those questions, that's intended to demonstrate your authority—to what's going on, isn't that right?

"A I wouldn't say demonstrate authority.

"Q What would you say?

"A To come to a conclusion to find the truth.

"Q When you're telling them that you could—in fact, you told the people that night that you could get a canine dog, right?

"A Yes.

"Q You told them that?

"A And one did show up on scene yes, eventually.

"Q Well, that was after you arrested everybody, right?

"A Yes.

"Q Okay, let's talk about before you took Mr. McBride out of the vehicle.

"A Yes, sir.

"Q Okay. You told them that you were planning on going to get a canine dog, weren't you?

"A Yes.

"Q And that they'd better—these might not be your exact words, but they better sort of let you know what's going on—

"A Correct."

By this time, four to five additional minutes had passed and seven minutes had elapsed since the initial encounter. The officer acknowledged that the occupants of the vehicle "possibly" were "making out."

McBride had initially rejected Officer Chindblom's request that McBride consent to a search of the car, but when the officer later renewed the request, McBride agreed. In order to conduct the search, McBride was asked to step from the vehicle and to stand to the side. Officer Chindblom returned to the vehicle to speak with the remaining occupants. They again stated that they were not engaged in any illegal activity. The officer noticed King was profusely sweating. He explained that his condition resulted from a broken air conditioner. However, the vehicle was off when the officer initially arrived on the scene. The officer returned to McBride, who was wearing shorts, to conduct a pat down for weapons. During the pat down, the officer noticed green flakes on McBride's shoes and legs that he believed from his training to be marijuana.[2] This prompted the officer to return to the

---

2. McBride informed the court the material was not marijuana but rather dried grass clippings.

vehicle. From outside the open driver's door, he observed, under the driver's seat, the handle of a silver semi-automatic handgun. McBride, King, and the remaining occupants were arrested.

A search of the vehicle also revealed another handgun under the driver's seat toward the rear passenger compartment. Seven or eight rounds of ammunition for various weapons were discovered in the front passenger door.

In denying King's motion to suppress the weapon and ammunition recovered from the vehicle, the court relied on Officer Chindblom's testimony.

"[T]here was no display of weapons, there was no physical touching prior to Mr. McBride exiting the vehicle and there being a pat down. I find that the language used and the tone used as I find it, do not indicate that compliance with the officer's request would be compelled absent consent. In other words, in the absence of such evidence, otherwise appropriate contact between members of the public and the police does not, without more, amount to seizure of the person, much less an unconstitutional seizure of the person."

The court also found that the police vehicles did not restrict McBride's ability to operate his sedan, that no emergency equipment was activated, and that the presence of the second officer did not escalate the nature of the encounter.

## DISCUSSION

We must determine if King's Fourth Amendment rights were violated prior to discovery of any incriminating evidence. Three types of police-citizen encounters are recognized under Maryland jurisprudence:

"The most intrusive encounter, an arrest, requires probable cause to believe that a person has committed or is committing a crime. The second category, the investigatory stop or detention, known commonly as a *Terry* stop, is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop

and briefly detain an individual. A police officer may engage in an investigatory detention without violating the Fourth Amendment as long as the officer has a reasonable, articulable suspicion of criminal activity. A *Terry* stop is limited in duration and purpose and can only last as long as it takes a police officer to confirm or to dispel his suspicions. A person is seized under this category when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority a reasonable person would have believed that he was not free to leave or is compelled to respond to questions. Factors that might indicate a seizure include a threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of language or tone of voice indicating that compliance with the officer's request might be compelled, approaching the citizen in a nonpublic place, and blocking the citizen's path.

"The least intrusive police-citizen contact, a consensual encounter, and the category at issue in this case, involves no restraint of liberty and elicits an individual's voluntary cooperation with non-coercive police contact. A consensual encounter need not be supported by any suspicion and because an individual is free to leave at any time during such an encounter, the Fourth Amendment is not implicated; thus, an individual is not considered to have been 'seized' within the meaning of the Fourth Amendment."

*Swift v. State,* 393 Md. 139, 150–51, 899 A.2d 867, 873–74 (2006) (citations omitted). If, during a consensual encounter, also referred to as a mere accosting, the officer "communicate[s] to a reasonable person that he or she was not free to ignore the police presence and go about their business, then the Fourth Amendment is implicated." *Ferris v. State,* 355 Md. 356, 375, 735 A.2d 491, 501 (1999). However, "[i]t is well established that the Fourth Amendment guarantees are not implicated in every situation where the police have contact with an individual." *Swift,* 393 Md. at 149, 899 A.2d at 873; *see also id.* at 152, 899 A.2d at 874 ("The request by a law

enforcement officer to examine a person's identification does not, in and of itself, make an encounter non-consensual.").

It must be noted, though, a police-citizen encounter "has been described as a fluid situation, and one which begins as a consensual encounter may lose its consensual nature and become an investigatory detention or an arrest once a person's liberty has been restrained[.]" *Id.* at 152, 899 A.2d at 874–75. "The test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a 'consensual' non-constitutional event is whether a reasonable person would have felt free to leave. [*United States v.*] *Mendenhall*, 446 U.S. [544,] 554, 100 S.Ct. [1870,] 1877 [64 L.Ed.2d 497 (1980)]." *Ferris*, 355 Md. at 375, 735 A.2d at 501; *see also California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) ("[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."). This determination is made by evaluating the totality of the circumstances. *Ferris*, 355 Md. at 376, 735 A.2d at 501.

In determining if a detention was an unconstitutional seizure, the Court of Appeals has stated that "[t]he transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow." *Id.* at 378 n. 6, 735 A.2d at 503 n. 6. In the instant case, neither party challenges the constitutionality of the initial stop. Rather, the Fourth Amendment becomes implicated if the reason for the initial encounter terminated, but the officer continued to detain the sedan's occupants. This is because "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). The circumstances here are that the initial encounter

was not a traffic stop, despite the arrestees being in a vehicle; nor was the initial encounter one between a pedestrian and the police. As such, we shall review a mix of cases.

In *Reynolds v. State*, 130 Md.App. 304, 746 A.2d 422, this Court reversed the denial of a defendant's motion to suppress due to an impermissible seizure. Two uniformed officers entered a housing complex in their marked cruisers at approximately 3:30 p.m. A group of ten individuals observed the officers and dispersed. The two officers focused on Reynolds and approached him. To their request for his name and date of birth, Reynolds replied truthfully. The officers then requested a warrant check and informed Reynolds that he was not free to leave until the results were known. Approximately five minutes passed until the officers learned that Reynolds had two outstanding warrants. He was arrested. We concluded that a reasonable person who opted to leave the scene once the police initially arrived, "would not *voluntarily* stand idly by for five minutes awaiting the results of the warrant check." *Id.* at 338, 746 A.2d at 440. Ultimately, we determined that a mere accosting was transformed into an illegal seizure. This result was required because

"[o]nce appellant responded to Detective Coleman's questions, without uncovering reasonable articulable suspicion or probable cause during the interview, the volitional character of the subsequent interaction between appellant and the police is undermined, not only because it lasted much longer than the time required to ask appellant his name and date of birth, but because no further exchange or substantive communication transpired prior to receipt of the teletype report. The subsequent detention disassembles the argument that the encounter was consensual and constitutes an illegal arrest the legal consequence of which cannot be reversed by the later establishment of probable cause. As a result, the contraband recovered from appellant should have been suppressed."

*Id.* at 346, 746 A.2d at 444.

In *State v. Darden*, 93 Md.App. 373, 612 A.2d 339, *cert. denied*, 328 Md. 447, 614 A.2d 974 (1992), *cert. denied*, 508

U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 673 (1993), we affirmed the grant of a motion to suppress because a police-citizen encounter that had begun as a constitutionally firm, consensual interaction escalated, impermissibly, into an unreasonable seizure. Darden disembarked from a train arriving from New York at the New Carrollton Amtrak station. Two police officers were assigned to the station specifically to watch for passengers matching a drug courier profile. Darden was identified as one such passenger. Initially, the police approached Darden and asked a series of questions. He appeared nervous, fumbled noticeably when retrieving his identification and train ticket, and was sweating profusely. The police asked and received consent to search his bag, but, as the search began, Darden withdrew consent and took possession of the bag. The officers informed Darden that he could leave but that they were going to maintain possession of the bag until a canine unit arrived. The dog arrived twenty minutes later and alerted, whereupon, the officers took the bag to a police station and obtained a search warrant. The search resulted in the discovery of 223.9 grams of cocaine and Darden's arrest.

The trial court granted Darden's motion to suppress, and this Court affirmed. We determined that the initial encounter between the police and Darden was consensual, a mere accosting. *Id.* at 382, 612 A.2d at 344. However, nothing during the encounter provided reasonable suspicion that Darden was involved in criminal activity. Thus, when the officers informed Darden that they were detaining his bag until a canine unit arrived, the encounter was escalated into a *Terry* stop. It was an unreasonable seizure under the Fourth Amendment, because

"there was neither evidence that Darden fit the drug courier profile nor was the issue of the existence, *vel non,* of reasonable articulable suspicion based on such a profile. The nervousness exhibited by Darden and the fact that he was en route from a source city and that he misspelled his name did not provide sufficient grounds for the police officers' investigatory stop. We hold, therefore, that the

police did not have a reasonable articulable suspicion that the appellant was engaged in any criminal wrongdoing." *Id.* at 387, 612 A.2d at 346.

Although not wholly analogous, it is also instructive to review situations where a police officer legally conducts a traffic stop but, after the initial purpose for the stop has concluded, the officer impermissibly continues the detention. In *Ferris*, an officer stopped a vehicle that was exceeding the speed limit. During the stop, the officer ran a license and warrant check; neither indicated a problem. Another officer arrived on the scene with partially activated emergency equipment. After the first officer had written the traffic citation, he returned Ferris's license. At this point, the officer, suspicious of Ferris's actions during the stop and his extremely bloodshot eyes, requested Ferris to step to the back of the vehicle to answer some questions. Ferris agreed and, under questioning, revealed that he had previously smoked a "joint" and that his passenger possessed a small amount of marijuana. The officer then searched the vehicle and found a large bag of marijuana.

Ferris unsuccessfully moved to suppress and was convicted of possession of marijuana. Ultimately, the Court of Appeals held that the trial court erred in failing to suppress. The Court analyzed these circumstances as demonstrating two separate encounters. The conclusion of the traffic stop was the end of the first, constitutional encounter. The Court noted that "the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention." *Ferris*, 355 Md. at 372, 735 A.2d at 499. The Court determined "the totality of the circumstances present in this case, at the moment Trooper Smith prolonged the encounter beyond the scope of the initial traffic stop, to be more coercive than consensual. We thus conclude that a reasonable person in Ferris's circumstances would have reasonably believed he was neither free to leave the scene nor to

ignore and disobey the police officer's 'requests.' " *Id.* at 377–78, 735 A.2d at 502.

The factors in deciding Ferris was not free to leave were, "the trooper never told Ferris he was free to leave, the trooper's 'request' of Ferris to exit the vehicle seamlessly followed the pre-existing lawful detention, the trooper removed Ferris from his automobile, the trooper separated Ferris from the passenger, there were two uniformed law enforcement officers present, the police cruiser emergency flashers remained operative throughout the entire encounter, and it was 1:30 a.m. on a dark, rural interstate highway." *Id.* at 378–79, 735 A.2d at 502–03. The Court held this "second" stop/continued detention was impermissible because "Trooper Smith's reliance on Ferris's nervousness and extremely bloodshot eyes was 'simply too slender a reed to support the seizure in this case.' " *Id.* at 392, 735 A.2d at 510 (quoting *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980)).

By contrast, in *Byndloss v. State*, 391 Md. 462, 468, 893 A.2d 1119, 1123 (2006), the Court of Appeals held a thirty-minute traffic stop, that included a canine sniff and alert, did not delay the encounter longer than the time necessary to effectuate the initial purpose of the stop. Officer Hughes of the Maryland State Police observed a vehicle, in which Byndloss was a passenger, traveling with the registration plates obscured by opaque plastic. This constituted a traffic violation and resulted in a lawfully initiated traffic stop. The officer contacted the College Park barrack at approximately 10:59 a.m. to report the fact that the stop had been made and was informed that the computer system for running license and warrant checks was not functioning. He then approached the vehicle, obtained the registration, and the driver's licenses of the two occupants and noticed that the driver appeared to be nervous. At 11:02 a.m., the officer returned to his vehicle and called for a canine unit. At 11:08 a.m., Officer Hughes completed writing the traffic citation. Within one minute thereafter, he radioed another barrack to obtain license and warrant checks but, due to interference, he signed off. At 11:10 a.m.,

he contacted the same barrack via cell phone and was informed that the dispatcher would run the information and call him back. The officer informed the driver that she could not leave because the license and warrant checks had not yet been run. Nine minutes later, when Officer Hughes called the barrack to check the status of the requested information, he was told to "standby." At 11:23 a.m., Officer Hughes again called the barrack but was told to continue to wait. The canine unit arrived at 11:26 a.m. and began a "sniff." During the canine sniff, Officer Hughes was informed that Byndloss had an extensive criminal background. Around this time the dog alerted which led to a full search of the vehicle and discovery of two kilograms of cocaine. *Id.* at 468–73, 893 A.2d at 1123–26.

Byndloss's motion to suppress the cocaine was unsuccessful, and he was convicted on multiple narcotics counts. The Court of Appeals affirmed the denial of the motion, because the purpose for the stop had not been completed by the time the canine unit arrived and alerted. In so holding, the Court stated,

> "that, under the particular facts and circumstances present in the case *sub judice,* the initial stop by Sergeant Hughes was not concluded at the time the K–9 dog alerted to the presence of narcotics. Sergeant Hughes with sufficient diligence pursued the acquisition of the records check involving the validity of [the driver's] license and registration, petitioner's driver's license, as well as warrant checks on both individuals. We find that the seizure or detention was reasonable under the circumstances. Therefore, there was no violation of petitioner's Fourth Amendment or [Maryland Constitution] Article 26 rights."

*Id.* at 492, 893 A.2d at 1137.

In the instant case, Officer Chindblom testified that he initially approached the sedan to "investigate" the anonymous citizen complaint regarding the flickering of a lighter in a darkened vehicle in an unlighted portion of a roadway after

midnight. But the purpose of that initial encounter had been satisfied *before* any handgun was observed.

 In the course of the encounter, Officer Chindblom had taken McBride's driver's license to run a warrant check, but had not returned it by the time of the initial observation of a handgun, even though the check revealed no basis for detaining the driver. Further, in conversation with the sedan's occupants during the encounter, Officer Chindblom stated that he would send for a canine unit. The unspoken corollary to that statement is that the occupants should not leave until the dog search had been conducted. Under these circumstances, a reasonable person would not feel free to leave. Thus, the encounter, at least by that point, became a seizure, and the Fourth Amendment was implicated.

 Lacking here, however, is any reasonable articulable suspicion that the occupants of the car were engaged in any criminal activity. Thus, the seizure was not reasonable. After conducting illuminated visual sweeps of the vehicle by search light and flashlight, Officer Chindblom observed no indication of criminal activity. Conversations with the four occupants revealed nothing constituting articulable suspicion of criminal activity. Neither McBride's nor King's perspiration or nervous appearance, alone, was enough to suggest criminal wrongdoing. *See Russell v. State,* 138 Md.App. 638, 653, 773 A.2d 564, 572 (2001) ("[O]rdinary nervousness, unaccompanied by other suspicious circumstances, cannot justify the continued detention of a lawfully detained person after the initial detention should be terminated."), *cert. dismissed,* 368 Md. 43, 791 A.2d 941 (2002). The officer did not smell any odor of illicit drugs. He did not observe any drug paraphernalia or, prior to the seizures of the sedan's occupants, any weapons. A license check did not return anything unusual. Continued questioning merely produced multiple assertions that the occupants were not engaged in illegal activity.

This police-citizen interaction morphed from a legal encounter that was properly concluded into a second "stop" that was not justified by reasonable articulable suspicion. The Fourth

Amendment violation occurred prior to McBride's exiting the vehicle and the discovery of the gun. The State does not argue that the later voluntary consent to a search of the car cured the prior violation. The suppression motion was improperly denied.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED AND CASE REMAND-ED.**

**COSTS TO BE PAID BY MONTGOMERY COUNTY, MARYLAND**