69 A.3d 74

**Thedral Thomas WILLIAMS, III**

v.

**STATE of Maryland.**

**No. 1597, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

June 26, 2013.

398

Michael T. Torres (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Carrie J. Williams (Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., KEHOE and JAMES P. SALMON, (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

Convicted of robbery with a dangerous weapon,[1] after pleading not guilty to an agreed upon statement of the facts in the

---

1. Williams was found guilty of violating Md.Code (2002, 2010 Supp.), § 3–403 of the Criminal Law Article, which provides, "A person may

Circuit Court for Kent County, Thedral Thomas Williams, III,[2] appellant, contends that the circuit court erred in denying his motion to suppress. Specifically, he maintains that the police lacked a reasonable suspicion of criminal activity, when they stopped the car in which he was a passenger, and lacked probable cause to arrest, when they blocked the doors of that vehicle with their patrol cars, preventing him from leaving it. We disagree and shall affirm.

## Suppression Hearing

■ Williams filed, as noted, a motion to suppress physical evidence seized and statements he made to police on the grounds that the car in which he was traveling was unlawfully stopped and then his exit from that vehicle was unlawfully blocked in violation of the Fourth Amendment. The testimony presented at his suppression hearing, viewed in the light most favorable to the prevailing party—in this instance, the State[3]—showed that at about 1:00 a.m., on January 4, 2011, Patrolman First Class Brett Lysinger of the Chestertown Police Department received two calls "almost simultaneously" from the police dispatcher: one concerned a home invasion at 108 Elm Street and the other a panic alarm at a Citgo gas station within yards of that house. When Patrolman Lysinger arrived at the location of the home invasion, he was informed

---

not commit or attempt to commit robbery under § 3–402 of this subtitle: (1) with a dangerous weapon; or (2) by displaying a written instrument claiming that the person has possession of a dangerous weapon."

**2.** As a result of the armed robbery conviction, Williams was sentenced to twenty years' incarceration with nine years suspended and, upon release, placed on supervised probation for five years. He was also ordered to pay, together with his co-defendant, $1400 restitution.

**3.** When we review a circuit court's disposition of a motion to suppress, we look exclusively at the record of the suppression hearing, view the evidence in the light most favorable to the prevailing party on the motion, and defer to the fact findings of the suppression judge unless clearly erroneous; however, we review the ultimate question of constitutionality *de novo*. *Walker v. State*, 206 Md.App. 13, 22–23, 47 A.3d 590 (2012).

by the home's owner that she had seen flashlights and that one or more individuals had attempted to break into her house. After checking the area around the house, the patrolman was advised by the dispatcher that the Citgo station call had been upgraded to an armed robbery. So he left the site of the alleged home invasion for the Citgo station.

Upon arriving at that location, he spoke to a clerk employed by the gas station. The clerk informed him that three males, with their faces covered, had entered the gas station store. After one of them brandished a sawed-off shotgun and demanded money, they forced him to lay on the ground face down and threatened to kill him if he looked up. After taking cash and cigarettes from the store, they fled.

When Patrolman Lysinger finished interviewing the clerk, he viewed, at the Citgo station, the surveillance video of the robbery, which showed "two black males" and "one possibly white male" entering the store from the direction of Greenwood Avenue, which is perpendicular to Elm Street, where the attempted home invasion had occurred. The videotape showed the three robbers fleeing in the same direction from which they had approached the Citgo.

Other units from the Maryland State Police and the Kent County Sheriff's Office were also at the scene. They stopped a vehicle, which was "almost directly in front of the Citgo." But, when it was determined that the occupants were neither witnesses nor suspects, the police allowed them to drive away. The only other vehicle that the patrolman recalled seeing while he was at the Citgo was a box delivery truck.

After viewing the videotape, Patrolman Lysinger called the dispatcher and requested a canine unit. Patrolman James Walker arrived with a dog to trace the departing suspects' path. The two patrolmen, joined by a Detective Lodge, then went to the Elm Street home to conduct a canine search. At that time, the streets and sidewalks, in what was described as a "secluded" residential neighborhood, were completely devoid of traffic of any sort, vehicular or pedestrian.

■ While the officers were standing in a yard adjacent to 108 Elm Street, the location of the attempted home invasion, with their vehicles' lights off, a Dodge suddenly appeared, after making a left turn onto Elm Street. It then passed by them, first slowing down and then speeding off. In the words of the patrolmen, the Dodge was driving at a "normal speed," but then it slowed down to between "3 to 5 miles an hour" as it passed by the officers, though the posted speed limit in that area was 25 miles per hour. At that point, the officers were able to "clearly observe" that there was a white male and a white female in the front seats of the car and two black males and a black female in the back seat. Patrolman Walker recognized the white male occupant seated in the front as someone he had had "prior dealings" with. Specifically, the patrolman knew him because of the occupant's "history of drug use." [4]

After the Dodge had passed the officers, the passengers in the rear seat looked back through the vehicle's rear window at the officers. The car then sped up as it left the area. Although no traffic violation had occurred, the officers decided to pull the Dodge over "to identify them as either possible witness [sic] or a . . . possibly suspects."

Patrolman Walker was the first officer to take off after the Dodge in his patrol car. Though right behind the Dodge, he had to "accelerate pretty heavily" to "at least 40 miles an hour . . . to catch the vehicle." At that time, "approximately 30 to 40 minutes" had elapsed since the initial call from the dispatcher.

When the pursuing patrolman activated his emergency lights, the Dodge slowed down and appeared to be coming to a

---

4. While on the witness stand, Patrolman Walker was asked if he knew the front-seat passenger and if his presence in the vehicle meant anything to him. Patrolman Walker responded, "I knew who he was. I had had dealings with him prior." He continued, "He . . . he has a history of drug use." Then defense counsel objected. The court, unaccountably, sustained the objection, given that this was a suppression hearing and not a trial and that information was relevant to the issue of whether police had reasonable suspicion.

stop, but, before it did, the driver's side rear-passenger door opened, prompting Patrolman Walker to pull up to the Dodge and position his patrol car so that it blocked what appeared to be an attempt to exit the moving vehicle. Moments later, when Patrolman Walker's fellow officer, Patrolman Lysinger, drove up in his patrol car, the rear door on the passenger's side of the Dodge also opened. Patrolman Lysinger then used his car to block any attempt to exit from that door as well. As the patrolmen were approaching the Dodge in their respective patrol cars, they both observed Williams and the other male passenger in the back seat of the Dodge trying to leave the vehicle as the female backseat passenger attempted to pull them back to prevent that from happening. As Patrolman Lysinger put it, Williams was "attempting to crawl over the female" in what appeared to be an effort to exit the Dodge. After getting out of his vehicle, Patrolman Walker instructed the occupants to stay in their car.

When Williams was ultimately removed from the rear seat, Patrolman Lysinger recognized him from "previous experiences." Patrolman Lysinger then patted down Williams. Feeling "a large bulge in . . . the leg area of his pants," the patrolman asked Williams what it was. Williams responded, "Money, man. It's money." Patrolman Lysinger then removed a "large stack of United States currency" from Williams's person.[5]

### Suppression Court Ruling

The suppression court held that the stop of the Dodge was a lawful investigatory stop and denied the suppression motion. Nearly a month later, Williams filed a motion for reconsideration. Without hearing argument, the court denied the motion.

---

5. No further description of what was seized by the patrolman was offered at the suppression hearing, but during the reading of the agreed upon statement of facts on Williams's trial date, it was noted that the Citgo clerk had reported that approximately $3,000 had been taken during the robbery. The amount found on Williams amounted to $2,150, and an additional $1,066 was retrieved from the Dodge's glove compartment and $25 was recovered from another occupant's pocket with notations on the bills in a Citgo employee's handwriting.

In so doing, it further explained that it found the officers had a reasonable articulable suspicion and that that suspicion justified the stop of the Dodge. Six days later, on the date of his trial, Williams, before entering his plea of not guilty, based on an agreed upon statement of facts, made what appeared to be a second motion for reconsideration of the denial of his suppression motion, contending, for the first time, that when the police "pinned" him in the Dodge by blocking, with their vehicles, the rear doors of the Dodge, that that action constituted an arrest, which was unsupported by probable cause. The court also denied that motion.

### DISCUSSION

### I.

■ It is not a violation of the Fourth Amendment for an officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This is known as an "investigatory stop" and is underlaid by "strong concerns for public safety and for effective crime prevention and detection[.]" *Quince v. State,* 319 Md. 430, 434, 572 A.2d 1086 (1990) (citing *United States v. Hensley,* 469 U.S. 221, 228–29, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

■ But what constitutes a reasonable suspicion? To answer that question, we first observe that the "level of [reasonable] suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less demanding than that for probable cause." *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581. But, predictably, there is no "standardized litmus test" that governs the determination of what is a reasonable suspicion. *Cartnail v. State,* 359 Md. 272, 286, 753 A.2d 519 (2000).

■ Rather, "reasonable suspicion" is a "common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act." *Id.* (citing *Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). To be more precise, in deciding whether reasonable suspicion justified an investigatory stop, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *Collins v. State,* 376 Md. 359, 368, 829 A.2d 992 (2003) (quoting *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)).

Williams contends that the trial court erred in denying his motion to suppress evidence, including the money taken from his pants,[6] as well as statements he subsequently made to police, during what he contends was an unlawful traffic stop. In support of his claim, Williams invokes the six factors identified in 4 Wayne R. LaFave, *Search & Seizure* § 9.4(g), at 550–51 (4th ed.2004), as relevant in determining whether police had a reasonable articulable suspicion to make an investigatory stop of a vehicle or person. They are:

(1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in other criminality of the type presently under investigation.

Selective in his application of these factors, Williams stresses that, when the car passed the officers, the police were only able to corroborate three characteristics of the perpetrators of

---

6. Other physical evidence was retrieved from the scene of the stop. On the date of Williams's trial, the agreed upon statement of facts was read into the record, which stated, "[s]uspected cocaine was found on the ground near the left passenger door."

the armed robbery with those of the occupants of the Dodge: race, gender, and proximity to the scene of the attempted break-in at 108 Elm Street; that the police were not searching for a particular vehicle; that there were more occupants in the Dodge than had been recorded by the gas station's surveillance video; that enough time had passed since the crime so that the time span, between the crime and the stop, could no longer be used as a reason to pull over the car; and that the rear passengers "merely looked" at the police when their car slowed and passed by. Williams concludes that the officers pulled over the Dodge based on a "hunch," not reasonable articulable suspicion and, therefore, evidence that was seized and statements that he made to police were the fruits of an unlawful stop and should have been suppressed.

To address Williams's contentions, we must first determine at what point in time Williams was "seized" under the Fourth Amendment. Justice Stewart, in his opinion in *United States v. Mendenhall,* which was later adopted by a majority of the Court,[7] declared that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). But, in *California v. Hodari D.,* the Supreme Court cautioned that, though the free-to-leave test was a "necessary" requirement in determining whether a person has been seized under the Fourth Amendment, it was not necessarily "sufficient." 499

---

**7.** In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), Justice Stewart announced the judgment of the Court and delivered an opinion that was joined in by only one other justice. Nonetheless, in subsequent cases, his free-to-leave test was adopted by a majority of the Court. *See INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *see also Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion).

U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In fact, a person is not seized, it declared, until he is restrained by physical force or by a "show of authority" to which he has yielded. *Id.* at 626, 111 S.Ct. 1547. *See Brendlin v. California,* 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." (citing *Hodari D.,* 499 U.S. at 626 & n. 2, 111 S.Ct. 1547)). *See Swift v. State,* 393 Md. 139, 152, 158, 899 A.2d 867 (2006) (applying *Mendenhall* and *Hodari D.*); *Ferris v. State,* 355 Md. 356, 375–76, 735 A.2d 491 (1999) (same); *see also Brummell v. State,* 112 Md.App. 426, 433–34, 685 A.2d 835 (1996).

Admittedly, the activation, as in the instant case, of the overhead emergency lights of a police car to induce a pursued vehicle to stop is a "show of authority." *See Lawson v. State,* 120 Md.App. 610, 616–17, 707 A.2d 947 (1998). But, Williams and the other male in the backseat of the Dodge did not yield to that show of authority until the vehicle came to a complete stop and their avenue of escape was blocked.

Indeed, as *Hodari D.* illustrates, although there is a "show of authority," a seizure does not take place until the subject yields to that "show of authority" and stops. In *Hodari D.,* two officers were on patrol in a high-crime area when they rounded a corner and saw a group of "youths" in a huddle, one of whom was Hodari. *Id.* at 622–23, 111 S.Ct. 1547. When the youths saw the officers approaching, they took flight and the officers gave chase. *Id.* at 623, 111 S.Ct. 1547. As Hodari fled, he did not see anyone chasing him until one of the officers was "almost upon him," whereupon Hodari tossed what appeared to be a small rock. *Id.* After the officer tackled and handcuffed him, the rock was recovered, and it was found to be crack cocaine. *Id.*

Even though the officer's pursuit of Hodari was a "show of authority," the Supreme Court held that Hodari was not

"seized," under the Fourth Amendment, because the language of the Fourth Amendment, more specifically, the word "seizure," does not "remotely apply ... to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id.* at 626, 111 S.Ct. 1547. Thus, the cocaine he had "tossed," the Court concluded, was not the fruit of an unlawful seizure. *Id.* at 629, 111 S.Ct. 1547.

We therefore conclude, as have many other courts, but not all,[8] that events that occur between a "show of authority" and the actual seizure may be considered in deciding whether police had reasonable suspicion to seize an individual. *See, e.g., United States v. Simmons,* 560 F.3d 98, 105–07 (2d Cir.2009); *United States v. Waterman,* 569 F.3d 144, 145–46 & n. 3 (3d Cir.2009); *United States v. Muhammad,* 463 F.3d 115, 123 (2d Cir.2006); *United States v. Swindle,* 407 F.3d 562, 567–69 (2d Cir.2005); *United States v. Smith,* 396 F.3d 579, 586 n. 5 (4th Cir.2005); *United States v. Valentine,* 232 F.3d 350, 358–59 (3d Cir.2000); *United States v. Johnson,* 212 F.3d 1313, 1316–17 (D.C.Cir.2000); *Watkins v. City of Southfield,* 221 F.3d 883, 889 n. 3 (6th Cir.2000); *United States v. Santamaria–Hernandez,* 968 F.2d 980, 981–83 (9th Cir.1992); *Plummer v. United States,* 983 A.2d 323, 331–34 (D.C.2009); *People v. Archuleta,* 980 P.2d 509, 514–15 (Colo.1999) (en banc); *Perez v. State,* 620 So.2d 1256, 1258 (Fla.1993). In

---

**8.** In contrast to the courts that have followed *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), a number of state courts have rejected its holding on state constitutional grounds. *See, e.g., State v. Garcia,* 147 N.M. 134, 217 P.3d 1032, 1042 (2009); *Joseph v. State,* 145 P.3d 595, 604–05 (Alaska App.2006); *State v. Beauchesne,* 151 N.H. 803, 868 A.2d 972, 978–80 (2005); *State v. Randolph,* 74 S.W.3d 330, 335–37 (Tenn.2002); *State v. Clayton,* 309 Mont. 215, 45 P.3d 30, 34 (2002); *Jones v. State,* 745 A.2d 856, 864–69 (Del.1999); *Baker v. Commonwealth,* 5 S.W.3d 142, 144–45 (Ky.1999); *State v. Young,* 135 Wash.2d 498, 957 P.2d 681, 686–87 (1998) (en banc); *Commonwealth v. Stoute,* 422 Mass. 782, 665 N.E.2d 93, 95–98 (1996); *Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769, 771–74 (1996); *Matter of Welfare of E.D.J.,* 502 N.W.2d 779, 781–83 (Minn. 1993); *People v. Hollman,* 79 N.Y.2d 181, 581 N.Y.S.2d 619, 590 N.E.2d 204, 211–12 (1992); *State v. Quino,* 74 Haw. 161, 840 P.2d 358, 362 (1992); *State v. Oquendo,* 223 Conn. 635, 613 A.2d 1300, 1308–10 (1992).

other words, a reasonable-articulable-suspicion inquiry begins, not when there is a "show of authority" by police, but when the subject yields to that "show of authority."

■ Before we address the factors that we believe gave rise to a reasonable suspicion, we note that, as Williams points out, Maryland appellate courts frequently consider LaFave's factors in performing a reasonable-articulable-suspicion analysis. *See Lewis v. State*, 398 Md. 349, 362, 920 A.2d 1080 (2007); *Myers v. State*, 395 Md. 261, 281, 909 A.2d 1048 (2006); *Collins*, 376 Md. at 369, 829 A.2d 992; *Stokes v. State*, 362 Md. 407, 420–21, 765 A.2d 612 (2001); *Cartnail*, 359 Md. at 289, 753 A.2d 519; *In re Lorenzo C.*, 187 Md.App. 411, 430–31, 978 A.2d 890 (2009); *Sykes v. State*, 166 Md.App. 206, 217, 887 A.2d 1095 (2005), *cert. denied*, 393 Md. 162, 900 A.2d 207 (2006); *Farewell v. State*, 150 Md.App. 540, 564–55, 822 A.2d 513 (2003), *cert. denied*, 376 Md. 544, 831 A.2d 4 (2003). But that approach, though helpful, is not, as Williams suggests, mandatory. The LaFave factors are not an exhaustive list, nor can they be, as new cases periodically present facts and circumstances that were not foreseen when this list was composed. Indeed, several factors in the instant case contributed to the formation of a reasonable suspicion, which are not part of LaFave's list, namely the secluded nature of the area where the stop occurred; the time of day of the stop; the total lack of vehicular and pedestrian traffic in that area; and the occurrence of two successive criminal intrusions within less than an hour in that small secluded area, suggesting a pattern of criminal conduct still in motion. Those factors, when combined with suspicious behavior of the occupants of the Dodge, gave rise, as we shall see, to a reasonable suspicion.

In describing the area where the stop occurred, Patrolman Walker testified that in the "all residential" neighborhood where 108 Elm Street is located, "nobody is out at that hour," and "once [the residents are in], they stay in." He stated that, when he and his fellow officers were standing on the front lawn of the house, where the attempted home invasion happened, "there was no body around" except them, and he

described the area as "off the beaten path" and "kind of secluded."

The suppression court agreed with the officers' characterization of the locality where the attempted burglary took place, observing that "in Chestertown, Maryland, a town of 5,000 people[,] . . . you don't expect to find many people on the highway anywhere, let alone at the time of the morning at that location." In fact, the officers had observed only three vehicles during the time that passed between the crime and the stop: the box delivery truck, the passenger vehicle that was stopped in front of the Citgo, and the Dodge, which contained Williams. Because there was no pedestrian and almost no vehicular traffic in the area where the police initiated the stop, both the location where the police observed the Dodge and the time of day when they observed it—approaching 2:00 a.m—are factors supporting, though hardly establishing, a reasonable articulable suspicion with respect to Williams's vehicle.

Moreover, though thirty to forty minutes had elapsed since the Citgo robbery—given the pattern of criminal conduct the police were presented with—that time period may be viewed as lending greater weight to the officers' suspicion. As the attempted home invasion and Citgo robbery occurred in close temporal and physical proximity to each other, and just a little more than a half hour before the stop at approximately the same location, it was not unreasonable to assume that the perpetrators were still in the area and on the lookout for other opportunities. That appears to have been the situation in *Farewell v. State,* 150 Md.App. 540, 565, 822 A.2d 513 (2003), where culprits had robbed a wine and beer store and then a pizza parlor in the "same general location" within a span of about fifty minutes.

To summarize, the police were aware that two crimes had occurred within a relatively short period of time, late in the very early morning hours of a weekday, and in close proximity within a relatively secluded residential area. The return to the scene of the attempted home invasion thirty to forty minutes after the initial call suggests that the occupants of the

Dodge may have gone back to check on police activity, complete the crime, or commit another one in that neighborhood.

We consider next the behavior of the occupants of the Dodge, which more than any other factor, laid the basis for a lawful investigatory stop. The Dodge drove directly in front of 108 Elm Street, the scene of the attempted home invasion, at an hour when and at a location where no one would be expected to be on the road. It was initially traveling at "normal" speed, but then slowed down as it passed the house and the officers at 108 Elm Street, who stood on the lawn without the lights of their vehicles on. As the car was driving by, individuals in the rear seat turned and looked through the vehicle's rear window at the officers. Fourth, once the car had passed, it immediately sped up, and turned onto another street, an action that could reasonably be interpreted as a form of flight.

Furthermore, although the Dodge had slowed down, in response to a flash of lights from Patrolman Walker's cruiser, it had not yet stopped, or as framed by the words of *Hodari D.*, it had not yet "yielded" to a "show of authority." It was then that Patrolman Walker and Patrolman Lysinger observed the two black male passengers, in the rear seat of the Dodge, attempting to leave that vehicle. Patrolman Lysinger stated that he saw Williams trying to climb over the female seated in the middle of the back seat of the car in what appeared to be an attempt to get out of the car and flee. At that moment, Patrolman Lysinger also saw the female passenger in the rear trying to keep both black male passengers from leaving the vehicle. The actions of Williams and the other male passenger were manifestly inconsistent with a "yielding" to a "show of authority" by police.

Then, while the Dodge was still moving, a rear door opened, prompting Patrolman Walker to use his vehicle to block any attempt to leave the Dodge by that door and flee. After that occurred, the other door opened, presumably, for the same purpose. The officers' seizure of the vehicle was certainly reasonable under circumstances given the furtive actions of

the occupants and the high probability that Williams and another passenger were actually engaged in an effort to flee the scene, factors which may be considered in making an arrest and, *a fortiori*, in making an investigatory stop. *See Collins*, 376 Md. at 374, 829 A.2d 992 ("[D]eliberately furtive actions and flight at the approach of strangers or law enforcement officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." (quoting *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968))).

The description that police had of the armed-robbery suspects was, to be sure, skimpy. From the gas station clerk's description and the security video, the officers learned that the three masked suspects were male, that two were black, and that one was possibly white. They had no information about any vehicle or about others who might have aided them. But, if a suspect has fled on foot, "it does not inevitably follow that it would be improper to stop a person driving a car, for the circumstances may also suggest a reasonable possibility that after escaping from the immediate vicinity of the crime the offender continued his flight in a car." 4 LaFave, *supra* § 9.4(g), at 559.

Finally, "race and ethnicity are identifying factors to be considered," though "they can never justify, by themselves, a *Terry* stop." *Cartnail*, 359 Md. at 291 n. 6, 753 A.2d 519. While keeping that in mind, we note that the car in question contained, within the larger group of occupants, a group of people of the same racial and gender composition as the robbers.

Given the totality of the circumstances, we conclude that the officers had reasonable articulable suspicion to conduct an investigatory stop based on the following: (1) the time of day; (2) the secluded nature of the area; (3) the total lack of any traffic—vehicular or pedestrian; (4) the relatively brief period of time between the occurrence of the successive crimes and

the stop; (5) the Dodge's appearance directly in front of the scene of the attempted break-in just a little more than a half-hour after Patrolman Lysinger received the initial call from dispatch; (6) the Dodge's dramatic change in speeds as it passed the officers; (7) the actions taken by the back seat passengers, specifically, in turning around and staring at the officers; (8) the confirmation by the officers that the occupants of the vehicle included the same racial and gender composition as the group of robbers; (9) the patrolman's recognition of one of the occupants as someone with whom he "had had dealings" prior to the stop; (10) Williams's attempted flight from the Dodge while the car was still moving; and (11) the attempt by the female passenger to try to keep the two males from fleeing.

Even if we were to view this matter from a point in time, that is, before the patrolman began his pursuit of the Dodge, we would come to the same conclusion as to reasonable suspicion. Given the secluded nature of the residential area, the time of day, the successive crimes that had occurred, the composition of the occupants of the Dodge, the occupants' behavior while they passed the officers, and the patrolman's recognition of one of the occupants, there were enough factors to establish a reasonable suspicion of criminal activity before the pursuit had begun.

Furthermore, Williams's assertion that the circumstances here are comparable to those in *Cartnail v. State,* 359 Md. 272, 753 A.2d 519 (2000), where the Court of Appeals held that a particular Terry stop was unlawful, is unpersuasive. In *Cartnail,* police, at approximately 1:49 a.m., responded to a reported robbery of a hotel, located near two interstate highways and several other major roadways. *Id.* at 277, 753 A.2d 519. The police were told that three males had fled from the scene in a gold or tan Mazda. *Id.* At about 3:05 a.m., nearly an hour and fifteen minutes after the reported robbery, the police stopped a gold Nissan with one black male driver and one black male passenger, at a location that was about two miles from the armed robbery. *Id.* at 277–78 & n. 1, 753 A.2d 519. After stopping the vehicle, the police learned that the

driver was operating the car on a suspended license. *Id.* at 278, 753 A.2d 519.

Holding that the officers did not have reasonable articulable suspicion to stop the Nissan, the Court of Appeals pointed out that the only factors that matched the description provided to the police were the occupants' gender and race and perhaps the color of their car. *Id.* at 293, 753 A.2d 519. The other factors, the court observed, "were too tenuously corroborated, or not corroborated at all." *Id.*

The circumstances leading up to the stop of the Dodge are quite different from those in *Cartnail.* The officers in *Cartnail* pulled over a Nissan and not a Mazda as reported, and it contained not three but only two individuals. And the *Cartnail* stop was made over an hour after the crime was reported.

In contrast, the Dodge contained a group that matched the racial and gender composition of the robbers of the Citgo station. Though the vehicle involved contained an additional two female occupants, that does not alter the equation, for "when the crime was committed by a group of a certain size, it makes no sense to suggest that only groups of that size may be stopped for investigation." 4 LaFave, *supra* § 9.4(g), at 559. Furthermore, the nature of the area and the time of day, along with the very recent occurrence of successive crimes and the behavior of the Dodge's occupants, weighed in favor of the officers' reasonable suspicion.

A case more on point and that, in fact, presents circumstances strikingly similar to those of the instant case is *People v. Ulrich,* 83 Mich.App. 19, 268 N.W.2d 269, 270–72 (1978). Though an extraterritorial case, it provides helpful guidance and support for the conclusion we reach today. In *Ulrich,* two masked men, armed with guns, robbed a bar at approximately 12:30 a.m. and fled in a vehicle driven by a third person. *Id.* at 270. Although the radio broadcast made no mention of a vehicle, two deputies traveled to a location they thought the robbers might use to escape. *Id.* One of the deputies testified that the road traffic had gone from "nothing to nil." *Id.*

Approximately twenty miles away from the crime scene and approximately twenty minutes after the crime had occurred, the deputies observed a pickup truck with three occupants traveling south. *Id.* The truck swayed as it was being driven down the road, and it slowed after passing the patrol car. *Id.* The deputies turned their car around and pursued the truck while driving below the speed limit. *Id.* During the pursuit, the deputies observed that a taillight was "out," that there was no license plate light on, and that the center passenger kept peering out the back window and looking around while the other passenger was "doing a lot of movement." *Id.* The deputies activated their overhead lights and stopped the truck. *Id.*

The Michigan Court of Appeals held that the stop was proper because, in addition to the defective license plate light, "the deputies had reasonable cause to make an investigative stop in connection with the armed robbery." *Id.* at 271. The court explained, "The pickup truck was headed rapidly away from the crime scene on a possible escape route, at a very late hour, in poor weather, and extremely light traffic swaying down the highway at a time and place where an escape vehicle could logically be expected to be found. In addition, the truck had three occupants when two persons had perpetrated the crime, and the pickup had slowed down upon passing the patrol car, one passenger repeatedly looking out the rear window at the officers." *Id.* at 271–72.

*Ulrich* is helpful because the Michigan court relied on several of the same factors as we do in this case. These factors include the time of day; the total lack of vehicular traffic in the area; the occupant's behavior, which included "peering" out the window; the slowing of the truck as it passed the police officers; and the fact that, among the occupants, was a group that consisted of the same racial and gender composition as the robbers.

## II.

Williams contends that, when the officers used their vehicles to block the rear passengers from escaping from the Dodge,

they effected an arrest, and therefore, according to Williams, the court erred in declaring that probable cause was not necessary to support use by police of their vehicles to prevent the suspects from getting out of the vehicle.

In analyzing the constitutionality of police-citizen encounters, we recognize three types of interactions, each of which permits a different degree of intrusiveness by law enforcement. *King v. State,* 193 Md.App. 582, 591–92, 998 A.2d 397 (2010). Although we must classify these interactions for purposes of review, an encounter in the field, we acknowledge, is "a fluid situation." *Swift,* 393 Md. at 152, 899 A.2d 867. Indeed, it may begin as a casual and voluntary interaction with law enforcement, but then may quickly be transformed into one where the freedom of movement of the person approached by law enforcement is temporarily limited or denied altogether. *Id.*

The first and least intrusive of such interactions is a "consensual encounter," that is, where "police *merely* approach a person in a public place, engage the person in conversation, request information and the person is free not to answer and walk away." *Id.* (emphasis in original). This lawful encounter may be conducted without any suspicion of criminal conduct or intention. *See Terry v. Ohio,* 392 U.S. 1, 34, 88 S.Ct. 1868, 20 L.Ed.2d 889 (White, J., concurring) ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets.").

The second type of police encounter permits the police to temporarily limit the freedom of the subject of the encounter. As we previously explained, this interaction is an "investigatory stop." An investigatory stop "is less intrusive than a formal custodial arrest and must be supported by reasonable suspicion that a person has committed or is about to commit a crime and permits an officer to stop and briefly detain an individual." *Id.* at 150, 899 A.2d 867.

The third and most intrusive encounter is an arrest, which must be based on probable cause to satisfy the

Fourth Amendment. But, "there are no *per se* rules or bright lines to determine when an investigatory stop and frisk becomes an arrest." *Reid v. State*, 428 Md. 289, 298, 51 A.3d 597 (2012) (quoting *In re David S.*, 367 Md. 523, 534, 789 A.2d 607 (2002)). *See Longshore v. State*, 399 Md. 486, 516, 924 A.2d 1129 (2007) ("[D]espite the changes in the contours of the *Terry* doctrine, there currently still are no bright lines to determine when an investigatory stop and frisk becomes an arrest and is elevated to the point that probable cause is required.").

"[I]n determining whether an investigatory stop is in actuality an arrest requiring probable cause, courts consider the 'totality of the circumstances.' " *State v. Rucker*, 374 Md. 199, 217, 821 A.2d 439 (2003) (quoting *In re David S.*, 367 Md. at 535, 789 A.2d 607). Although "no one factor is dispositive," *In re David S.*, 367 Md. at 535, 789 A.2d 607, "generally, a display of force by a police officer, such as putting a person in handcuffs, is considered an arrest." *Longshore*, 399 Md. at 502, 924 A.2d 1129. But, force is reasonable during an investigatory detention where it "is used to protect officer safety or to prevent a suspect's flight." *Elliott v. State*, 417 Md. 413, 429, 10 A.3d 761 (2010); *see also Bailey v. State*, 412 Md. 349, 372 n. 8, 987 A.2d 72 (2010); *Longshore*, 399 Md. at 519 n. 7, 924 A.2d 1129 (listing cases); *In re David S.*, 367 Md. 523, 539–40, 789 A.2d 607 (2002). The State, however, has the burden "to prove that such special circumstances existed in order to justify the officer's use of force in an investigative detention." *Elliott*, 417 Md. at 429, 10 A.3d 761.

"It is generally recognized that an arrest is the taking, seizing, or detaining of the person of another (1) by touching or putting hands on him; (2) or by any act that indicates an intention to take him into custody and that subjects him to the actual control and will of the person making the arrest...." *Id.* at 428, 10 A.3d 761 (citing *Bouldin v. State*, 276 Md. 511, 515–16, 350 A.2d 130 (1976).) [9]

---

9. The *Bouldin* Court also defined arrest as the "detention of a known or suspected offender for the purpose of prosecuting him for a crime," 276

 Williams asserts, citing *Dixon v. State*, 133 Md.App. 654, 758 A.2d 1063 (2000), that we have previously "found ... that using police vehicles to block a car can constitute an arrest." In *Dixon*, police received a tip from an informant that a man would be transporting ten pounds of marijuana to the second level of a parking garage. When the officers arrived at that garage, Dixon's car was parked on the second floor, but he was not in it. Over an hour later, Dixon emerged from the garage's stairwell and walked to his car. After he unlocked the car door, opened it, and entered his vehicle, the police "blocked the vehicle in" with their unmarked police cars, and then removed Dixon from the car and handcuffed him. The actions taken by police in the parking garage "exceeded an investigatory stop," we said. *Id.* at 673, 758 A.2d 1063. When "they blocked his car, removed him from his vehicle, and handcuffed him," he was, we concluded, under arrest. *Id.*

It is clear that, when Patrolmen Lysinger and Walker pulled their vehicles up to the Dodge's doors to prevent the occupants from leaving that vehicle, they had not arrested Williams, and therefore, the circumstances before us are distinguishable from those in *Dixon*. The actions taken by the patrolmen were only initiated to prevent flight, and at that point, unlike in *Dixon*, they had not removed Williams from the car or handcuffed him. Moreover, the patrolmen had no immediate intent to arrest the occupants of the Dodge, when they decided to pursue Williams's vehicle. The stop was made "to identify them as either possible witness [*sic* ] or a ... possibly suspects." Nor did they place their hands on Williams or any of the occupants. At the time the officers pulled their patrol cars up, they had not indicated, in any way, that they were making more than an investigatory stop, and there is nothing in the record indicating that Williams thought he had been arrested at the time his path of escape was blocked.

Md. 511, 516, 350 A.2d 130 (1976), but the Court of Appeals later rejected this language. *See State v. Evans,* 352 Md. 496, 514, 723 A.2d 423 (1999) ("[W]hether the officer intends that a detention lead to a prosecution has no bearing on whether an arrest has occurred.").

We find *State v. Dick,* 181 Md.App. 693, 957 A.2d 150 (2008), more helpful on this question. There, two detectives had just learned of an alleged drug transaction from another pair of detectives that had observed an exchange between a man on a bike and a man on foot, one of whom was James Dick. The two detectives, who had not seen that actual transaction, then caught up with the man on foot. One detective "drove his car into the alley until he was in front of Dick, while [the other detective] pulled into the mouth of the alley to the rear of the suspect." *Id.* at 698, 957 A.2d 150. The detective, who was parked in front of Dick, opened the door to his vehicle, stepped out, and stood between the door and the opening to his car—he was about three feet from Dick. The detective identified himself as a police officer and informed Dick that his team had witnessed him engage in a drug transaction. After Dick acted like he did not know what the detective was talking about, the detective attempted to speak with Dick, but Dick pushed the detective in the chest and ran. *Id.* Eventually the two detectives captured Dick and subdued and searched him. In his pocket, they found thirty-four packages of crack cocaine with some cash.

In determining whether the stop, in that case, had evolved into an arrest, requiring probable cause, we discussed factors that might have contributed to that transformation but ultimately concluded that, under the circumstances, the stop did not escalate into an arrest. *Id.* at 710, 957 A.2d 150. We explained that before Dick ran from the detectives, the officers had not touched him or handcuffed him or taken him to a police station or to a police vehicle. But most importantly, and, of particular relevance to the case before us, we said that "[b]ecause during the brief period of such an investigatory stop, the subject is not free to go, the fact that the vehicles blocked Dick from leaving is not conclusive in finding that an arrest had occurred." *Id.* at 709, 957 A.2d 150. "[A] blocking vehicle," we stressed, "is not the motorized equivalent of handcuffing." *Id.*

In the instant case, the officers wanted to speak to the occupants to determine whether they knew anything about the

Citgo robbery or home invasion or whether they were involved in either or both. And before they had even decided to stop the car, factors linked the occupants to the crimes under investigation, namely, the time of the stop; the secluded nature of the neighborhood; the racial and gender composition of the occupants (which matched the robbers' description); the temporal and physical proximity of the two crimes to each other, as well as to the location; and the officer's "prior dealings" with one of the occupants.

It has been widely held that officers may use even greater force, than was used here, when a suspect is attempting to flee or to protect the police from potential danger, force that does not necessarily amount to an arrest of the detained person, such as forcing the suspect to the ground and handcuffing him. *See, e.g., In re David S.,* 367 Md. at 539, 789 A.2d 607 (not an arrest when defendant was forced to the ground and placed in handcuffs); *Trott v. State,* 138 Md.App. 89, 118, 770 A.2d 1045 (2001) (not necessarily an arrest when defendant was handcuffed because it was a "protective and flight preventive measure"). While it is true that using their vehicles to block any escape from the rear of the Dodge was a show of force by the police, an objective assessment of the circumstances leads us to conclude that the officers were simply trying to prevent the occupants from fleeing the scene, rather than attempting to arrest them. And, as we stated in *Dick,* the fact that the officers used their cars to prevent Williams from leaving does not automatically elevate an encounter to an arrest, and, we conclude that, here, it did not. Therefore, we hold, after considering the totality of the circumstances, that the suppression court did not err in concluding that an arrest was not made when the two officers pulled their police cars up to prevent Williams from leaving the vehicle, and hence, the officers' actions did not need to be supported by probable cause to be lawful.

**JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**